## SAIA *v.* NEW YORK.

No. 504.   Argued March 30, 1948.—Decided June 7, 1948.

*Hayden C. Covington* argued the cause and filed a brief for appellant.

*Alan V. Parker* submitted on brief for appellee.

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BLACK.

This case presents the question of the validity under the Fourteenth Amendment of a penal ordinance of the City of Lockport, New York, which forbids the use of sound amplification devices except with permission of the Chief of Police.[1]

---

[1] The ordinance, insofar as pertinent, reads as follows:

"Section 2. Radio devices, etc. It shall be unlawful for any person to maintain and operate in any building, or on any premises or on any automobile, motor truck or other motor vehicle, any radio device, mechanical device, or loud speaker or any device of any kind whereby the sound therefrom is cast directly upon the streets and public

Appellant is a minister of the religious sect known as Jehovah's Witnesses. He obtained from the Chief of Police permission to use sound equipment, mounted atop his car, to amplify lectures on religious subjects. The lectures were given at a fixed place in a public park on designated Sundays. When this permit expired, he applied for another one but was refused on the ground that complaints had been made. Appellant nevertheless used his equipment as planned on four occasions, but without a permit. He was tried in Police Court for violations of the ordinance. It was undisputed that he used his equipment to amplify speeches in the park and that they were on religious subjects. Some witnesses testified that they were annoyed by the sound, though not by the content of the addresses; others were not disturbed by either. The court upheld the ordinance against the contention that it violated appellant's rights of freedom of speech, assembly, and worship under the Federal Constitution. Fines and jail sentences were imposed. His convictions were affirmed without opinion by the County Court for Niagara County and by the New York Court of Appeals, 297 N. Y. 659, 76 N. E. 2d 323. The case is here on appeal.

We hold that § 3 of this ordinance is unconstitutional on its face, for it establishes a previous restraint on the

places and where such device is maintained for advertising purposes or for the purpose of attracting the attention of the passing public, or which is so placed and operated that the sounds coming therefrom can be heard to the annoyance or inconvenience of travelers upon any street or public places or of persons in neighboring premises.

"Section 3. Exception. Public dissemination, through radio loudspeakers, of items of news and matters of public concern and athletic activities shall not be deemed a violation of this section provided that the same be done under permission obtained from the Chief of Police."

Appellant's conduct was regarded throughout as falling within the types of activity enumerated in § 3. We take the ordinance as construed by the State courts.

right of free speech in violation of the First Amendment which is protected by the Fourteenth Amendment against State action. To use a loud-speaker or amplifier one has to get a permit from the Chief of Police. There are no standards prescribed for the exercise of his discretion. The statute is not narrowly drawn to regulate the hours or places of use of loud-speakers, or the volume of sound (the decibels) to which they must be adjusted. The ordinance therefore has all the vices of the ones which we struck down in *Cantwell* v. *Connecticut,* 310 U. S. 296; *Lovell* v. *Griffin,* 303 U. S. 444; and *Hague* v. *C. I. O.,* 307 U. S. 496.

In the *Cantwell* case a license had to be obtained in order to distribute religious literature. What was religious was left to the discretion of a public official. We held that judicial review to rectify abuses in the licensing system did not save the ordinance from condemnation on the grounds of previous restraint. *Lovell* v. *Griffin, supra,* held void on its face an ordinance requiring a license for the distribution of literature. That ordinance, like the present one, was dressed in the garb of the control of a "nuisance." But the Court made short shrift of the argument, saying that approval of the licensing system would institute censorship "in its baldest form." In *Hague* v. *C. I. O., supra,* we struck down a city ordinance which required a license from a local official for a public assembly on the streets or highways or in the public parks or public buildings. The official was empowered to refuse the permit if in his opinion the refusal would prevent "riots, disturbances or disorderly assemblage." We held that the ordinance was void on its face because it could be made "the instrument of arbitrary suppression of free expression of views on national affairs." 307 U. S. p. 516.

The present ordinance has the same defects. The right to be heard is placed in the uncontrolled discretion of the

Chief of Police. He stands athwart the channels of communication as an obstruction which can be removed only after criminal trial and conviction and lengthy appeal. A more effective previous restraint is difficult to imagine. Unless we are to retreat from the firm positions we have taken in the past, we must give freedom of speech in this case the same preferred treatment that we gave freedom of religion in the *Cantwell* case, freedom of the press in the *Griffin* case, and freedom of speech and assembly in the *Hague* case.[2]

Loud-speakers are today indispensable instruments of effective public speech. The sound truck has become an accepted method of political campaigning. It is the way people are reached. Must a candidate for governor or the Congress depend on the whim or caprice of the Chief of Police in order to use his sound truck for campaigning?

---

[2] *Cox* v. *New Hampshire*, 312 U. S. 569, 577–578, did not depart from the rule of these earlier cases but re-emphasized the vice of the type of ordinance we have here. *Davis* v. *Massachusetts*, 167 U. S. 43, was distinguished in the *Hague* case, 307 U. S. pp. 514–516, which likewise involved an ordinance regulating the use of public streets and parks. It was there said, "We have no occasion to determine whether, on the facts disclosed, the *Davis* case was rightly decided, but we cannot agree that it rules the instant case. Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

We adhere to that view. Though the statement was that of only three Justices, it plainly indicated the route the majority followed, who on the merits did not consider the *Davis* case to be controlling.

Must he prove to the satisfaction of that official that his noise will not be annoying to people?

The present ordinance would be a dangerous weapon if it were allowed to get a hold on our public life. Noise can be regulated by regulating decibels. The hours and place of public discussion can be controlled. But to allow the police to bar the use of loud-speakers because their use can be abused is like barring radio receivers because they too make a noise. The police need not be given the power to deny a man the use of his radio in order to protect a neighbor against sleepless nights. The same is true here.

Any abuses which loud-speakers create can be controlled by narrowly drawn statutes. When a city allows an official to ban them in his uncontrolled discretion, it sanctions a device for suppression of free communication of ideas. In this case a permit is denied because some persons were said to have found the sound annoying. In the next one a permit may be denied because some people find the ideas annoying. Annoyance at ideas can be cloaked in annoyance at sound. The power of censorship inherent in this type of ordinance reveals its vice.

Courts must balance the various community interests in passing on the constitutionality of local regulations of the character involved here. But in that process they should be mindful to keep the freedoms of the First Amendment in a preferred position. See *Marsh* v. *Alabama,* 326 U. S. 501, 509.

*Reversed.*

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE REED and MR. JUSTICE BURTON concur, dissenting.

The appellant's loud-speakers blared forth in a small park in a small city.[1] The park was about 1,600 feet

---

[1] The last census gave the population of Lockport as 24,379.

long and from 250 to 400 feet wide. It was used primarily for recreation, containing benches, picnic and athletic facilities, and a children's wading pool and playground. Estimates of the range of the sound equipment varied from about 200 to 600 feet. The attention of a large fraction of the area of the park was thus commanded.

The native power of human speech can interfere little with the self-protection of those who do not wish to listen. They may easily move beyond earshot, just as those who do not choose to read need not have their attention bludgeoned by undesired reading matter. And so utterances by speech or pen can neither be forbidden nor licensed, save in the familiar classes of exceptional situations. *Lovell* v. *Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496; *Schneider* v. *Irvington,* 308 U. S. 147; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568. But modern devices for amplifying the range and volume of the voice, or its recording, afford easy, too easy, opportunities for aural aggression. If uncontrolled, the result is intrusion into cherished privacy. The refreshment of mere silence, or meditation, or quiet conversation, may be disturbed or precluded by noise beyond one's personal control.

Municipalities have conscientiously sought to deal with the new problems to which sound equipment has given rise and have devised various methods of control to make city life endurable. See McIntire and Rhyne, Radio and Municipal Regulations (National Institute of Municipal Law Officers, Report No. 62, 1940) pp. 28 *et seq.* Surely there is not a constitutional right to force unwilling people to listen. Cf. Otto, *Speech and Freedom of Speech,* in Freedom and Experience (Edited by Hook and Konvitz, 1947) 78, 83 *et seq.* And so I cannot agree that we must deny the right of a State to control these broadcasting devices so as to safeguard the rights of

others not to be assailed by intrusive noise but to be free to put their freedom of mind and attention to uses of their own choice.

Coming to the facts of the immediate situation, I cannot say that it was beyond constitutional limits to refuse a license to the appellant for the time and place requested. The State was entitled to authorize the local authorities of Lockport to determine that the well-being of those of its inhabitants who sought quiet and other pleasures that a park affords, outweighed the appellant's right to force his message upon them. Nor did it exceed the bounds of reason for the chief of police to base his decision refusing a license upon the fact that the manner in which the license had been used in the past was destructive of the enjoyment of the park by those for whom it was maintained. That people complained about an annoyance would seem to be a pretty solid basis in experience for not sanctioning its continuance.

Very different considerations come into play when the free exercise of religion is subjected to a licensing system whereby a minor official determines whether a cause is religious. This was the problem presented by *Cantwell* v. *Connecticut,* 310 U. S. 296, and of course we held that "Such a censorship of religion as the means of determining its right to survive is a denial of liberty protected by the First Amendment and included in the liberty which is within the protection of the Fourteenth." 310 U. S. at 305. To determine whether a cause is, or is not, "religious" opens up too wide a field of personal judgment to be left to the mere discretion of an official. As to the allowable range of judgment regarding the scope of "religion," see Judge Augustus N. Hand in *United States* v. *Kauten,* 133 F. 2d 703, 708. The matter before us is of quite a different order. It is not unconstitutional for a State to vest in a public official the determination of what is in effect a nuisance merely because

such authority may be outrageously misused by trying to stifle the expression of some undesired opinion under the meretricious cloak of a nuisance. Judicial remedies are available for such abuse of authority, and courts, including this Court, exist to enforce such remedies.

Even the power to limit the abuse of sound equipment may not be exercised with a partiality unrelated to the nuisance. But there is here no showing of either arbitrary action or discrimination. There is no basis for finding that noisemakers similar to appellant would have obtained a license for the time and place requested. Reference is found in the testimony to the use of loudspeakers for Lutheran services in a nearby ballfield. But the ballfield was outside the park in which appellant blared to his audience, and there is nothing in the record to show that the Lutherans could have used their amplifying equipment within the park, or that the appellant would have been denied permission to use such equipment in the ballfield. See *Lehon* v. *Atlanta,* 242 U. S. 53. State action cannot be found hypothetically unconstitutional. *New York ex rel. Hatch* v. *Reardon,* 204 U. S. 152.

The men whose labors brought forth the Constitution of the United States had the street outside Independence Hall covered with earth so that their deliberations might not be disturbed by passing traffic. Our democracy presupposes the deliberative process as a condition of thought and of responsible choice by the electorate. To the Founding Fathers it would hardly seem a proof of progress in the development of our democracy that the blare of sound trucks must be treated as a necessary medium in the deliberative process. In any event, it would startle them to learn that the manner and extent of the control of the blare of the sound trucks by the States of the Union, when such control is not arbitrarily and discriminatorily

566

exercised, must satisfy what this Court thinks is the desirable scope and manner of exercising such control.

We are dealing with new technological devices and with attempts to control them in order to gain their benefits while maintaining the precious freedom of privacy. These attempts, being experimental, are bound to be tentative, and the views I have expressed are directed towards the circumstances of the immediate case. Suffice it to say that the limitations by New York upon the exercise of appellant's rights of utterance did not in my view exceed the accommodation between the conflicting interests which the State was here entitled to make in view of time and place and circumstances. See *Cox* v. *New Hampshire,* 312 U. S. 569.

MR. JUSTICE JACKSON, dissenting.

I dissent from this decision, which seems to me neither judicious nor sound and to endanger the great right of free speech by making it ridiculous and obnoxious, more than the ordinance in question menaces free speech by regulating use of loud-speakers. Let us state some facts which the Court omits:

The City of Lockport, New York, owns and maintains a public park of some 28 acres dedicated by deed to "Park purposes exclusively." The scene of action in this case is an area therein set apart for the people's recreation. The City has provided it with tables, benches, and fireplaces for picnic parties, a playground and wading pool for children, and facilities for such games as horseshoe pitching, bowling and baseball.

The appellant, one of Jehovah's Witnesses, contends, and the Court holds, that without the permission required by city ordinance he may set up a sound truck so as to flood this area with amplified lectures on religious subjects. It must be remembered that he demands even more than the right to speak and hold a meeting in this

area which is reserved for other and quite inconsistent purposes. He located his car, on which loud-speakers were mounted, either in the park itself, not open to vehicles, or in the street close by. The microphone for the speaker was located some little distance from the car and in the park, and electric wires were strung, in one or more instances apparently across the sidewalk, from the one to the other. So that what the Court is holding, is that the Constitution of the United States forbids a city to require a permit for a private person to erect, in its streets, parks and public places, a temporary public address system, which certainly has potentialities of annoyance and even injury to park patrons if carelessly handled. It was for setting up this system of microphone, wires and sound truck without a permit, that this appellant was convicted—it was not for speaking.

It is astonishing news to me if the Constitution prohibits a municipality from policing, controlling or forbidding erection of such equipment by a private party in a public park. Certainly precautions against annoyance or injury from operation of such devices are not only appropriate, but I should think a duty of the city in supervising such public premises. And a very appropriate means to supervision is a permit which will inform the city's police officers of the time and place when such apparatus is to be installed in the park. I think it is a startling perversion of the Constitution to say that it wrests away from the states and their subdivisions all control of the public property so that they cannot regulate or prohibit the irresponsible introduction of contrivances of this sort into public places.

The Court, however, ignores the aspects of the matter that grow out of setting up the system of amplifying appliances, wires and microphones on public property, which distinguish it from the cases cited as authority.

It treats the issue only as one of free speech. To my mind this is not a free speech issue.[1] Lockport has in no way denied or restricted the free use, even in its park, of all of the facilities for speech with which nature has endowed the appellant. It has not even interfered with his inviting an assemblage in a park space not set aside for that purpose.[2] But can it be that society

---

[1] More than fifty years ago this Court in *Davis* v. *Massachusetts*, 167 U. S. 43, affirmed a state court decision (162 Mass. 510) written by Mr. Justice Holmes and holding constitutional an ordinance providing that "no person shall, in or upon any of the public grounds, make any public address . . . except in accordance with a permit from the mayor." Mr. Justice Holmes had pointed out that the attack on the ordinance's constitutionality "assumes that the ordinance is directed against free speech generally, . . . whereas in fact it is directed toward the modes in which Boston Common may be used." That case, directly in point here, and approving a regulation of the right of speech itself, certainly controls this one, which involves only regulation of the use of amplifying devices, and, as applied to this appellant, forbade only unauthorized use in a park dedicated exclusively to park purposes. Moreover, the *Davis* case approved the requirement that a permit be obtained from a city official before "any public address". could be made "in or upon any of the public grounds."

The *Davis* case was not overruled in the cases cited by the Court. And all of those cases were considered and distinguished in *Cox* v. *New Hampshire*, 312 U. S. 569, written by Mr. Chief Justice Hughes for a unanimous Court, and which approved regulation and licensing of parades and processions in public streets even for admittedly religious purposes.

The case of *Hague* v. *C. I. O.*, 307 U. S. 496, cannot properly be quoted in this connection, for no opinion therein was adhered to by a majority of the Court. The quotation in the Court's opinion today had the support of only two Justices, with a possible third. The failure of six or seven Justices to subscribe to those views would seem to fatally impair the standing of that quotation as an authority.

[2] Nothing in the ordinance interferes with freedom of religion, freedom of assembly or freedom of the press. Indeed, the effect of § 3, which the Court summarily strikes down as void on its face, is to authorize the Chief of Police to permit use of "radio devices,

has no control of apparatus which, when put to unregulated proselyting, propaganda and commercial uses, can render life unbearable? It is intimated that the City can control the decibels; if so, why may it not prescribe zero decibels as appropriate to some places? It seems to me that society has the right to control, as to place, time and volume, the use of loud-speaking devices for any purpose, provided its regulations are not unduly arbitrary, capricious or discriminatory.

But the Court points out that propagation of his religion is the avowed and only purpose of appellant and holds that Lockport cannot stop the use of loud-speaker systems on its public property for that purpose. If it is to be treated as a case merely of religious teaching, I still could not agree with the decision. Only a few weeks ago we held that the Constitution prohibits a state or municipality from using tax-supported property "to aid religious groups to spread their faith." *McCollum* v. *Board of Education,* 333 U. S. 203. Today we say it compels them to let it be used for that purpose. In the one case the public property was appropriated to school uses; today it is public property appropriated and equipped for recreational purposes. I think Lockport had the right to allocate its public property to those purposes and to keep out of it installations of devices which would flood the area with religious appeals obnoxious to many and thereby deprive the public of the enjoyment of the property for the purposes for which it was properly set aside. And I cannot see

mechanical devices, or loud speakers" where the subject matter is "news and matters of public concern and athletic activities," even though "the sound therefrom is cast directly upon the streets and public places" and "the sounds coming therefrom can be heard to the annoyance or inconvenience of the travelers upon any street or public places or of persons in neighboring premises," which would, without § 3, be barred by § 2.

570

how we can read the Constitution one day to forbid and the next day to compel use of public tax-supported property to help a religious sect spread its faith.

There is not the slightest evidence of discrimination or prejudice against the appellant because of his religion or his ideas. This same appellant, not a resident of Lockport but of Buffalo, by the way, was granted a permit by the Chief of Police and used this park for four successive Sundays during the same summer in question. What has been refused is his application for a second series of four more uses of the park. Lockport is in a climate which has only about three months of weather adaptable for park use. There are 256 recognized religious denominations in the United States and, even if the Lockport populace supports only a few of these, it is apparent that Jehovah's Witnesses were granted more than their share of the Sunday time available on any fair allocation of it among denominations.

There is no evidence that any other denomination has ever been permitted to hold meetings or, for that matter, has ever sought to hold them in the recreation area. It appears that on one of the Sundays in question the Lutherans were using the ball park. This also appears to be public property. It is equipped with installed loudspeakers, a grandstand and bleachers, and surrounded by a fence six feet high. There is no indication that these facilities would not be granted to Jehovah's Witnesses on the same terms as to the Lutherans. It is evident, however, that Jehovah's Witnesses did not want an enclosed spot to which those who wanted to hear their message could resort. Appellant wanted to thrust their message upon people who were in the park for recreation, a type of conduct which invades other persons' privacy and, if it has no other control, may lead to riots and disorder.

The Court expresses great concern lest the loud-speakers of political candidates be controlled if Jehovah's Witnesses can be. That does not worry me. Even political candidates ought not to be allowed irresponsibly to set up sound equipment in all sorts of public places, and few of them would regard it as tactful campaigning to thrust themselves upon picnicking families who do not want to hear their message. I think the Court is over-concerned about danger to political candidacies and I would deal with that problem when, and if, it arises.

But it is said the state or municipality may not delegate such authority to a Chief of Police. I am unable to see why a state or city may not judge for itself whether a Police Chief is the appropriate authority to control permits for setting up sound-amplifying apparatus. *Cox v. New Hampshire,* 312 U. S. 569. It also is suggested that the city fathers have not given sufficient guidance to his discretion. But I did not suppose our function was that of a council of revision. The issue before us is whether what has been done has deprived this appellant of a constitutional right. It is the law as applied that we review, not the abstract, academic questions which it might raise in some more doubtful case.

I disagree entirely with the idea that "Courts must balance the various community interests in passing on the constitutionality of local regulations of the character involved here." It is for the local communities to balance their own interests—that is politics—and what courts should keep out of. Our only function is to apply constitutional limitations.

I can only repeat the words of Mr. Justice Holmes, disregarded in his time and even less heeded now:

> "I have not yet adequately expressed the more than anxiety that I feel at the ever increasing scope given to the Fourteenth Amendment in cutting down what

I believe to be the constitutional rights of the States. As the decisions now stand, I see hardly any limit but the sky to the invalidating of those rights if they happen to strike a majority of this Court as for any reason undesirable. I cannot believe that the Amendment was intended to give us *carte blanche* to embody our economic or moral beliefs in its prohibitions." [3]

And even if this were a civil liberties case, I should agree with Chief Justice Hughes, writing for a unanimous Court:

"Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." [4]

The judgment of the Court of Appeals of New York should be affirmed.

---

[3] *Baldwin* v. *Missouri*, 281 U. S. 586, 595.
[4] *Cox* v. *New Hampshire*, 312 U. S. 569, 574.