**Florian Frederick CHESS, Dale Rhoton, Ronald Barnes, Glenn P. Garrison, Kathleen Anne Aguirre, Douglas Neef, Vincent Clark and James S. Colmer, Jr., Plaintiffs,**

v.

**Gary E. WIDMAR, the Board of Curators of the University of Missouri, Barbara Berkmeyer, Daniel L. Brenner, Robert A. Demptster, William T. Doak, C. R. Johnston and Marian Oldham, Defendants.**

No. 77–0756–W–2.

United States District Court,
W. D. Missouri, W. D.

Dec. 11, 1979.

James M. Smart, Jr., William H. Pickett, Kansas City, Mo., for plaintiffs.

Jackson A. Wright, Marvin E. Wright, James S. Newberry and Ted D. Ayres, Columbia, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

COLLINSON, District Judge.

This action was filed on October 13, 1977 by eleven students at the University of Missouri-Kansas City (hereinafter university). The eleven students are part of a religious group called Cornerstone, which is an officially recognized student group at the university. The students' complaint alleges that university officials have refused to allow the students involved in Cornerstone to conduct their regular religious services in university-owned buildings. The students contend that the university's refusal to permit their group to use university facilities violates their rights guaranteed by the first and fourteenth amendments to the United States Constitution. On July 18, 1978, the students filed an amended complaint in which they request both a declaratory judgment and injunctive relief.

The parties have filed cross-motions for summary judgment and have stipulated that the following facts are not in dispute.

1. Cornerstone is an officially recognized student organization at the campus of the University of Missouri—Kansas City (UMKC). UMKC is a part of the Universi-

ty of Missouri system which is governed by the Board of Curators of the University of Missouri, which is an official body established by the state constitution of Missouri for the government of the University and its affairs.

2. The individuals named as plaintiffs were enrolled as students at UMKC at the time this action was commenced and were involved in Cornerstone. Plaintiffs Garrison, Aguirre, Colmer and Cyman are not presently enrolled as students at UMKC. The balance of the named plaintiffs are still presently enrolled at UMKC, and still participate in Cornerstone activities.

3. Under past and current policy of the University of Missouri, one of the benefits afforded recognized student organizations is the privilege of using the student center and certain other facilities of the University as a place in which to meet, subject to certain limitations as to time, place and conduct of the proposed meeting.

4. Each student enrolling at the University of Missouri-Kansas City pays a "Center Activities—Athletic Fee." This fee is $35.00 for all those enrolling for at least ten credit hours of instruction, and is something less for those taking fewer hours of instruction. The proceeds from the "Center Activities—Athletic Fee" go, in part, to fund the operation of the student center (referred to at many schools as a student union).

5. The following regulations are presently in effect at UMKC and throughout all campuses of the University and have been in effect since sometime in 1972:

4.0314.0107 No university buildings or grounds (except chapels as herein provided) may be used for purposes of religious worship or religious teaching by either student or non-student groups. Student congregations of local churches or of recognized denominations or sects, although not technically recognized campus groups, may use the facilities, commonly referred to as the student union or center or commons under the same regulations that apply to recognized campus organizations, provided that no University facilities may be used for purposes of religious worship or religious teaching. The general prohibition against use of University buildings and grounds for religious worship or religious teaching is a policy required, in the opinion of The Board of Curators, by the Constitution and laws of the State and is not open to any other construction. No regulations shall be interpreted to forbid the offering of prayer or other appropriate recognition of religion at public functions held in University facilities. This provision does apply to such buildings as may be designated under provision of part .0106.

4.0314.0108 Regular chapels established on University grounds may be used for religious services but not for regular recurring services of any groups. Special rules and procedures shall be established for each such chapel by the Chancellor. It is specifically directed that no advantage shall be given to any religious group.

6. In early January, 1977, pursuant to established University procedures, Cornerstone applied for the privilege of using the University facilities, on a regular basis, for holding Cornerstone meetings.

7. Said application of Cornerstone was rejected on or about February 4, 1977, because the University, after asking for clarification as to the activities to be conducted at the proposed meetings, concluded that the conduct of the proposed meetings would be in violation of regulations 4.0314.0107 and 4.0314.0108. In reaching such conclusions, the University relied primarily on the letter of one of plaintiffs' attorneys, which was written on behalf of Cornerstone to Mr. Gary E. Widmar, Dean of Students, UMKC. The letter states:

Re: Request of Cornerstone
for use of University
Facilities

Dear Dean Widmar:

Thank you for meeting with my clients and me on January 20. You will recall that at that time we briefly discussed the request of Cornerstone for the use of

university facilities, and I advised you that I would be submitting a legal memorandum supporting our view that the law prohibits the discriminatory banning of religious activities from university property.

Since you mentioned that you had been consulting with Mr. Marvin Wright of the University Counsel's office in regard to this question, I decided that I would address the legal memorandum to Mr. Wright and furnish you with a copy. But I also wish to take this opportunity to respond to your request for more information regarding the nature and purpose of the Cornerstone meetings.

Typical Cornerstone meetings in University facilities usually include the following:

1. The offering of prayer;
2. The singing of hymns in praise and thanksgiving;
3. The public reading of scripture;
4. The sharing of personal views and experiences (in relation to God) by various persons;
5. An exposition of, and commentary on, passages of the Bible by one or more persons for the purpose of teaching practical biblical principles; and
6. An invitation to the interested to meet for a personal discussion.

As you probably already know, these meetings are open to the public. Any students, be they Jewish, Christian, Moslem, or any other persuasion are invited, and, in fact, actively recruited by the students in Cornerstone.

Although these meetings would not appear to a casual observer to correspond precisely to a traditional worship service, there is no doubt that worship is an important part of the general atmosphere. There also is no doubt that the undecided and the uncommitted are encouraged and challenged to make a personal decision in favor of trusting in Jesus Christ both for salvation and for the power to live an abundant Christian life on earth.

There are no collections or solicitations of funds at these meetings, and there are no specific rituals or practices of any particular denomination or sect.

I assume that the foregoing information will be sufficient. If more is needed, please let me know and we will be happy to provide it for you. In the meantime, I am herewith resubmitting in behalf of Cornerstone the group's request for the use of University facilities.

In view of the recent Delaware decision enclosed with my letter to Mr. Wright, I do not feel the University could be criticized for allowing Cornerstone to continue to meet pending further clarification of the law. And I must point out that it is very important to my clients that they be able to continue to use University facilities, particularly in view of some special meetings planned during mid-February.

Thank you for your consideration.

Very truly yours,
James M. Smart, Jr.

8. As a result of said rejection of the application of Cornerstone to use University facilities, Cornerstone has not been permitted to use the University facilities as a place in which to hold meetings of the type described in their application since the date of the rejection of said application. In addition, Cornerstone has not been permitted to hold small group Bible studies on the University lawn or in other University facilities.

9. Although various religious groups, including Cornerstone, have been permitted to meet in the facilities of the University in the past, neither the Chancellor nor the Dean of Students of the University of Missouri—Kansas City have ever authorized a student organization to utilize a University facility for a meeting where they had full knowledge that the purposes of the meeting include religious worship or religious teaching.

10. The University has only one physical facility designated as a chapel and it is located on the Columbia campus of the University and was built and paid for totally by private donations and funds.

11. If Florian Frederick Chess were summoned to testify of his personal knowledge as to matters pertinent to the issues of this case, his testimony would be the same as the content of his affidavit dated September 29, 1977, and filed with the Motion for Preliminary Injunction in this case. In that affidavit, Mr. Chess states:

1. I am a student at the University of Missouri—Kansas City and I reside at 4914 Grand Avenue, Apartment 12, Kansas City, Missouri 64112. My telephone number is 753–5185.

2. I am involved in a recognized student group on the UMKC campus called Cornerstone.

3. For the last year or two we have had at any one time perhaps twenty students who participate actively in Cornerstone and form the backbone of the campus organization. There are many other students who come to meetings and get-togethers of our group less frequently, but still on a somewhat regular basis. Students can be involved as much or as little as they desire. We do not have memberships or dues and we have very little formal organization. We have, however, in the past been one of the most, if not the most, active organization on campus.

4. We are a group of people who believe that Christianity is pertinent to everyday life—even the life of a student. We find our Christianity—which we would define as a personal relationship with a resurrected, living Savior—to be relevant to all aspects of our lives. For instance, when we make value decisions as to how we relate to people, whether or not we should be honest in taking examinations, what our attitudes should be towards sex and marriage, how we should respond to our parents and to others in authority, what we should pursue for a career—and in all of such matters, we find that our Christianity has something to say and is therefore intensely practical. We are not a denomination and we are not concerned with religious ritual and religious ceremony, but instead with the practical aspects of how Christianity and the Bible relate to every aspect of our lives.

5. Our purpose as a group is to promote a knowledge and awareness of Jesus Christ on the campus, and also, of course, to encourage one another in the faith and to grow in the grace and knowledge of the Lord Jesus Christ. To carry out these objectives we must meet together, provide a forum for our message, and have a place for interested students to meet with us.

6. We have been meeting regularly on the campus since about 1972 or 1973. We have met at different locations on campus, always with permission. Last year we met regularly at 103 Haig Hall Annex for our Saturday night meetings. We have had up to one hundred and twenty-five people at the meetings on several occasions, and frequently have had at least one hundred.

7. We also in the past have had some Bible studies on campus with permission. During the 1975–1976 year we had a weekly study in Room 34 of the Education Building.

8. The program for our Saturday night meetings on campus consisted of Bible study and teaching, prayer informal sharing, and singing. All are welcome to attend, and, in fact, it is our purpose to attract the uninvolved so that they too might assure themselves that the answers to life's ultimate questions rest with Jesus Christ and the Bible.

9. We have never had nor sought any official promotion or sanction as to our activities or purposes from the university administration, and we expect no more accommodation than that which is afforded other recognized student groups.

10. The prohibition against meeting on campus which began in February, 1977, has had a very significant impact on our meetings, on our attendance, and on our ability to maintain the momentum of our outreach to students and faculty.

11. We have continued to meet, of course, but being off campus has had many unfortunate disadvantages:

a) One disadvantage is a loss of visibility and identity as a campus organization. In a real sense, we are no longer a "campus" organization, and it is difficult to interest other students in any activities which are off campus. Students know that if something is on campus, then it is a student organization, and they are more likely to feel comfortable attending a meeting.

b) Another disadvantage is increased confusion. Even though we have begun meeting in a house located only about a block and a half from the campus, students who are not familiar with where we are meeting are not as likely to go to an unfamiliar address on a residential street (Charlotte Street) as they would be to go to a regularly used and well-known campus building.

c) Another disadvantage is decreased comfort. Interested visitors are not encouraged to return by the crowded and uncomfortable conditions that exist at the meetings on Charlotte Street. Not only is the house severely overcrowded, but the house is so constructed that probably no more than about forty percent of those in attendance can see the person speaking even when the speaker stands in the most observable position.

d) Another disadvantage is lack of convenience and efficiency. It is just not as convenient for students to go off campus as it takes more time out of their schedules.

e) Another disadvantage is the burden that it places upon those who host the meetings. We have been having roughly seventy-five people at our regular off-campus meetings.

f) Another disadvantage is that it makes our message and our purposes seem more remote and less relevant to the typical student. Having to explain that we have to meet off campus tends to make students think that there is something "wrong" with us and that there is something wrong with religion since it has been banished from the campus. This leads to the kind of thinking which holds that religion is obsolete and has nothing to do with the realities of life. This type of thinking is a large barrier to the effectiveness of our message and the purposes of our group.

g) In addition, and also as a result of the above stated factors, we have experienced a definite decrease in the attendance at our activities. We have continued to promote our activities and have continued our efforts to attract other students, but our attendance has been lower since we were forced off campus. We seem to have an average attendance of roughly seventy-five or so at our recent meetings since being forced off campus, and it would be physically impossible for us to accommodate many more than now attend. It would be impossible, for instance, to accommodate the one hundred and twenty-five we used to have at some of our campus meetings on previous occasions when we were permitted to meet on campus.

/s/ Florian Frederick Chess
Florian Frederick Chess

12. If Jonathan Williams were summoned to testify of his own personal knowledge as to matters pertinent to the issues of this case, his testimony would be the same as the content of his affidavit dated September 29, 1977, and filed with the Motion for Preliminary Injunction in this case. In that affidavit Mr. Williams states:

1. I am a student at the University of Missouri—Kansas City and I reside at 5532A Troost, Kansas City, Missouri. My telephone number is 444-6679. I am involved in the Cornerstone organization.

2. Our group has been prohibited from holding our regular meetings in university buildings since last February.

3. On about August 29, 1977, Tony Hallman, a friend of mine who is also involved in Cornerstone, and I went together to the University Buildings and Grounds office to see if it would be possible to have an informal Bible study for a

small group of people (approximately twenty or so) on the lawn on the grounds of the university. We talked with Mr. Hatch, the Chief of Buildings and Grounds.

4. After describing to Mr. Hatch why we had come, Mr. Hatch showed us the university regulation which prohibited the use of the university premises for "religious teaching" and "religious worship." Mr. Hatch then asked what we would do at these meetings, and I told him that we would read our Bibles and talk about things in the Bible. Mr. Hatch advised us that, in his view, the only way that we could be permitted to meet was if we presented all possible views of the Bible fairly, and not talk about just one view of the Bible. Although Mr. Hatch was pleasant and sympathetic, he was firm in his position. Mr. Hatch never inquired about the size of the group, nor did he give any other reason as to why we would not be permitted to meet on the grounds.

5. Since the regulation Mr. Hatch had cited mentioned that we could meet in a chapel if there was one, I inquired about the possibility that a chapel would be built. Mr. Hatch stated that if we wanted a chapel, we would have to "get the ball rolling" ourselves and that it would have to be funded by private donations.

6. Mr. Hatch then referred us to Mr. Claiborne Harper, Business Officer in the university administration, who we went to see that same day. We ended up seeing a Mr. Stan Dalen, Assistant Business Officer, instead. He in turn called Dean Gary Widmar, Dean of Students. Mr. Dalen then said that Dean Widmar suggested that we talk to Dr. Paul Parker, an administrator in charge of "Student Life."

7. We went to see Dr. Parker and explained to him why we had come. Dr. Parker stated that he could not give us permission to meet because of the university's policy about religious meetings, and he stated that he was surprised that Dean Widmar had suggested that we come to see him. He stated that, "until this thing is cleared up, I cannot approve your request."

8. I have also read the affidavit of Florian Frederick Chess dated Sept. 29, 1977 in regard to the impact of the prohibition on our campus ministry, and I find the things stated therein to be true and correct to the best of my knowledge and belief.

/s/ Jonathan Williams
Jonathan Williams

Plaintiffs' complaint includes allegations that they have been deprived, under color of state law, of rights and privileges guaranteed by the United States Constitution. Those allegations are a sufficient basis for this Court to exercise jurisdiction over plaintiffs' claim. 28 U.S.C. § 1343 (1976). The parties have not addressed the questions whether these plaintiffs have standing to bring this action and whether the action is moot. This Court has, however, carefully considered those issues and finds that the action is in a proper posture for decision.

This cause now pends on the parties' cross-motions for summary judgment. After consideration of the parties' stipulations and their suggestions in support of their motions for summary judgment, this Court is convinced that the material facts are not in dispute and that summary judgment is, therefore, appropriate.

The sole university practice challenged in this action is the refusal, by the university, to permit plaintiffs to conduct regular religious services in university-owned buildings. Plaintiffs do not contend that they are treated differently from any other religious group on campus. Nor do plaintiffs contend that they are limited, in any way, from holding on-campus meetings that do *not* include religious worship services.

 Plaintiffs present several arguments in support of their contention that the university's refusal to permit Cornerstone to hold religious worship services in university-owned buildings is constitutionally impermissible. First, plaintiffs argue that the university's policy violates their right to free exercise of their religion as guaranteed

by the first and fourteenth amendments. The first amendment to the United States Constitution provides, in pertinent part:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof;

U.S. Const. Amend. 1. Both the establishment clause and the free exercise clause of the first amendment have been made applicable to the States through the fourteenth amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). There is no dispute that the actions of the university, for the purposes of this lawsuit, may be treated as actions of the State of Missouri. The university's actions are, thus, subject to the limitations of the first amendment as applied to the States through the fourteenth amendment.

This Court understands plaintiffs' free exercise argument to be that the university's ban on religious services in university-owned buildings infringes their right to practice their religion on the university campus. In response, defendants argue that the university's ban on religious activities in university-owned buildings is required by the establishment clause of the first amendment. Defendants also argue, alternatively, that the State of Missouri's interest in maintaining a strict separation of church and state is a sufficiently compelling interest to justify whatever infringement, if any, of plaintiffs' free exercise rights that may result from the ban on religious activities in university-owned buildings.

■ The starting point for this Court's analysis is the question whether the university's ban on religious activities in university-owned buildings is required by the establishment clause of the first amendment. That question is not easily answered. As Chief Justice Burger has observed, "candor compels the acknowledgement that we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication." *Tilton v. Richardson,* 403 U.S. 672, 678, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971). The Supreme Court has, however, provided some guidance in this difficult area. The Supreme Court's establishment clause cases, taken together, make clear that three factors should be considered in determining whether a certain regulation or practice violates the establishment clause:

[T]he law in question, first must reflect a clearly secular legislative purpose, second, must have a primary effect that neither advances nor inhibits religion, and third, must avoid excessive government entanglement with religion.

*Committee for Public Education v. Nyquist,* 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973) (citations omitted); *Bogen v. Doty,* 598 F.2d 1110, 1113 (8th Cir. 1979). In applying those factors to the facts of this case, this Court finds that the first and third factors do not operate to bar the request for use of the university's buildings. A university policy that permitted *any* student group to meet in university-owned buildings for *any* purpose would aid all student groups, regardless of religious affiliation and would, therefore, reflect a clear secular purpose. In addition, since such a policy would make no distinction between groups or their purposes, entanglement with religion would be completely avoided. The second factor, whether the primary effect either advances or inhibits religion, is, however, not so easily answered. This Court draws guidance from the Supreme Court's analysis of this factor in its establishment clause cases.

■ The answer to the question of whether a policy that permitted the conduct of religious services in government-owned buildings would have the effect of advancing religion was first suggested by Justice Brennan in *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). In his concurring opinion, Justice Brennan stated:

The State must be steadfastly neutral in all matters of faith, and neither favor nor inhibit religion. In my view, government cannot sponsor religious exercises in the public schools without jeopardizing that neutrality. On the other hand, hostility, not neutrality, would characterize

the refusal to provide chaplains and places of worship for prisoners and soldiers cut off by the State from all civilian opportunities for public communion, the withholding of draft exemptions for ministers and conscientious objectors, or the denial of the *temporary* use of an empty public building to a congregation whose place of worship has been destroyed by fire or flood.

374 U.S. at 299, 83 S.Ct. at 1612 (concurring opinion) (emphasis added). Justice Brennan also noted, however, that "A different problem may be presented with respect to the *regular* use of public school property for religious activities." *Id.* at 298 n. 74, 83 S.Ct. at 1611 n. 74 (emphasis added). The outcome suggested by Justice Brennan in *Abington School District, supra,* was adopted by the Court seven years later in *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1970) (hereinafter *Tilton* ). *Tilton* involved an establishment clause challenge to federal expenditures for classroom facilities at church-related colleges and universities. One question before the Court was whether the United States could subsidize university facilities that might be used for religious instruction, religious training, or worship. The Congressional action challenged in *Tilton* limited the use of the federally-subsidized buildings to secular purposes for the first twenty years after the buildings were completed. After that first twenty years, however, there would exist no enforceable restrictions on the use of the buildings. The Court found the potential for religious use of the federally-subsidized buildings to have the primary effect of advancing religion, and, thus, to violate the establishment clause:

Under § 754(b)(2), therefore, a recipient institution's obligation not to use the facility for sectarian instruction or religious worship would appear to expire at the end of 20 years. We note, for example, that under § 718(b)(7)(C) (1964 ed., Supp. V), an institution applying for a federal grant is only required to provide assurances that the facility will not be used for sectarian instruction or religious worship "during at least the period of the Federal interest therein (as defined in section 754 of this title)."

Limiting the prohibition for religious use of the structure to 20 years obivously opens the facility to use for any purpose at the end of that period. It cannot be assumed that a substantial structure has no value after that period and hence the unrestricted use of a valuable property is in effect a contribution of some value to a religious body. Congress did not base the 20-year provision on any contrary conclusion. *If, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion.*

*To this extent the Act therefore trespasses on the Religion Clauses.* The restrictive obligations of a recipient institution under § 751(a)(2) cannot, compatibly with the Religion Clauses, expire while the building has substantial value.

*Tilton, supra* at 683, 91 S.Ct. at 2098 (emphasis added).

This Court finds the Supreme Court's clear holding in *Tilton* to control the question of whether university-owned buildings may be used for religious purposes. In this case, it is uncontradicted that plaintiffs seek to use state-owned buildings on a regular basis for the conduct of their religious worship services. Thus, the practice that plaintiffs request this Court to force upon the university is identical to the practice that the *Tilton* Court found to have a primary effect of advancing religion. This Court does not read *Tilton* to apply only to church-related universities. The *Tilton* Court specifically noted that, "these [church-related university] buildings are indistinguishable from a state university facility." *Tilton, supra* at 680, 91 S.Ct. at 2096.

In *Tilton,* the Court held that if a practice has the primary effect of advancing religion it violates the establishment clause. *Tilton, supra* at 683, 91 S.Ct. 2091. In light of *Tilton,* this Court finds that a university policy permitting regular religious services

in university-owned buildings would have the primary effect of advancing religion. This Court holds, therefore, that the university's present ban on religious services in its buildings is required by the establishment clause.

Plaintiffs rely on *Keegan v. University of Delaware*, 349 A.2d 14 (Del.Supr.1975) (hereinafter *Keegan*), as support for their contention that UMKC could, without violating the establishment clause, permit plaintiffs to hold regular religious services in university-owned buildings. This Court has carefully considered the Supreme Court of Delaware's opinion in *Keegan* and finds that the outcome in that case is not supported by the controlling law. In *Keegan*, the Supreme Court of Delaware was faced with facts that are indistinguishable from the facts of this case. The plaintiffs in *Keegan* were a group of students who sought permission to hold regular worship services in the commons area of a university-owned dormitory. In defending its refusal to permit the religious services, the University of Delaware argued that to permit the religious services would be a violation of the establishment clause. The Supreme Court of Delaware rejected that argument. Citing *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and Committee for *Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2988, 37 L.Ed.2d 948 (1973), the Supreme Court of Delaware found, without analysis, that a policy permitting the requested religious services, "would not have an effect that primarily advances religion, would not reflect a sectarian legislative purpose, and would not foster excessive government entanglement with religion." *Keegan, supra* at 16. Citing *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), and *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1953), again without analysis, the *Keegan* Court went on to hold, "To allow religious worship groups the same rights and privileges attendant with the use of the commons room of the dormitory as are accorded other group activities would reflect a lawful accommodation." *Keegan, supra* at 16.

Neither *Lemmon v. Kurtzman, supra*, nor *Committee for Public Education v. Nyquist, supra*, stand for the proposition for which they were cited by the Supreme Court of Delaware. *Lemon v. Kurtzman, supra*, involved an establishment clause challenge to state aid to church-related elementary and secondary schools. The Supreme Court held that the challenged statutes violated the establishment clause. *Committee for Public Education v. Nyquist, supra*, involved an establishment clause challenge to three of the State of New York's programs for assistance to low income school-age children. As in *Lemon v. Kurtzman, supra*, the programs were held to be unconstitutional. Neither of those cases stand for the proposition that religious worship services may be conducted in state-owned buildings without violating the establishment clause of the first amendment. Likewise, neither *Zorach v. Clauson, supra*, nor *Abington School District v. Schempp, supra*, stand for the propositions for which they were cited. *Zorach v. Clauson, supra*, involved an establishment clause challenge to a State of New York program that permitted public school students to leave the school buildings, during regular school hours, to attend religious services. In holding that the program did not violate the establishment clause, the Court relied on the fact that no religious services were conducted in the public school buildings. That case must, therefore, be distinguished from this case where the question presented is whether religious services may be held in a state-owned building. In *Abington School District v. Schempp, supra*, the Court held that a Pennsylvania law that required reading of the Bible in public schools violated the establishment clause. Neither case can be read to hold that religious groups may be accommodated by permitting them to hold their services in a state-owned building. In addition, the Supreme Court of Delaware failed to discuss *Tilton, supra*, which is the sole Supreme Court opinion where the question of religious use of university buildings has been presented. This Court is convinced that the outcome in *Keegan* cannot

be reconciled with the Supreme Court's opinion in *Tilton, supra.* Accordingly, this Court finds the Supreme Court of Delaware's opinion in *Keegan* of no value in deciding the establishment clause question that is before this Court.

■ Next, plaintiffs take the position that, even if the conduct of their religious services in university-owned buildings would violate the establishment clause, the university's ban on the religious services must still be struck down because it violates plaintiffs' rights to free exercise of their religion. The basis for this position is plaintiffs' argument that the Supreme Court has relegated the establishment clause to a position inferior to that of the free exercise clause. This Court finds that plaintiffs' position on this point is without merit. First, this Court is not convinced that plaintiffs' right to freely exercise their religion is infringed, in any way, by the university's ban on religious activities in university-owned buildings. In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court made clear that, to invoke the protection of the free exercise clause, the infringed practice must be, "one of deep religious conviction, shared by an organized group, and intimately related to daily living." *Wisconsin v. Yoder*, 406 U.S. 205, 216, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). The facts before this Court simply to not establish that the "practice" of holding religious services in a university-owned building is a matter of deep religious conviction to these plaintiffs. At most, the parties' stipulations support a finding that plaintiffs *prefer* having their religious services in a university-owned building to having the services in a building or home off-campus. In *Wisconsin v. Yoder, supra*, the Court specifically held that "matter[s] of personal preference" are not entitled to the protection of the religion clauses. *Wisconsin v. Yoder, supra* at 216, 92 S.Ct. 1526.

Second, even if plaintiffs had established that their free exercise rights were somehow infringed by the university's ban on religious services, this Court finds that, as argued by defendants, the State of Missou-ri's interest in maintaining a strict separation of church and state is a sufficiently compelling interest to overbalance plaintiffs' claims to free exercise of religion. There is no necessity for this Court to retrace Missouri's long history of strict separation of church and state. That history has been held to evidence a compelling interest in maintaining that separation:

> We conclude without hesitation that the long established constitutional policy of the State of Missouri, which insists upon a degree of separation of church and state to probably a higher degree than that required by the First Amendment, is indeed a "compelling state interest in the regulation of a subject within the State's constitutional power," within the standard enunciated in *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 341, 9 L.Ed.2d 405 (1963), and applied in *Sherbert* [*v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965]. That interest, in our judgment, satisfies any possible infringement of the Free Exercise clause of the First Amendment or of any other prohibition in the Constitution of the United States. We likewise find and conclude that Missouri's interest in that subject is within Missouri's constitutional power and that such interest may properly be described as an "interest of the highest order" within the meaning of *Yoder* and within the meaning of all the other various descriptive terms set forth in *United States v. O'Brien* [391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672] above quoted.

*Luetkemeyer v. Kaufman*, 364 F.Supp. 376, 386 (W.D.Mo.1973), *affirmed* 419 U.S. 888, 95 S.Ct. 167, 42 L.Ed.2d 134 (1974).

■ Third, this Court is unconvinced by plaintiffs' argument that the Supreme Court has made the establishment clause subordinate to the free exercise clause. In support of that argument, plaintiffs cite *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). After reviewing those two opinions, this Court disagrees with

plaintiffs' reading of those cases. In *Sherbert v. Verner, supra,* the Court specifically held that State accommodation of the Seventh-Day Adventist's beliefs did *not* violate the establishment clause. *Sherbert v. Verner, supra,* 374 U.S. at 409, 83 S.Ct. 1790. The majority opinion in *Sherbert v. Verner, supra,* does not even include a discussion of the tension between the establishment clause and the free exercise clause. In *Wisconsin v. Yoder, supra,* the majority opinion does include a discussion of the interplay between the religion clauses:

> The Court must not ignore the danger that an exception from a general obligation of citizenship on religious grounds may run afoul of the Establishment Clause, but that danger cannot be allowed to prevent any exception no matter how vital it may be to the protection of values promoted by the right of free exercise. By preserving doctrinal flexibility and recognizing the need for a sensible and realistic application of the Religion Clauses
>
> > "we have been able to chart a course that preserved the autonomy and freedom of religious bodies while avoiding any semblance of established religion. This is a 'tight rope' and one we have successfully traversed." *Walz v. Tax Commission, supra,* [397 U.S. 664] at 672, 90 S.Ct. 1409 [, 25 L.Ed.2d 697].

*Wisconsin v. Yoder, supra,* 406 U.S. at 220–221, 92 S.Ct. at 1536. This Court interprets that passage to mean that a mere *danger* of an establishment clause violation cannot serve as a justification for interference with free exercise rights. The Court makes clear that the proper course is one that both avoids infringement of free exercise rights and "avoid[s] any semblance of established religion." *Wisconsin v. Yoder, supra* at 221, 92 S.Ct. at 1536. The two cases relied upon by plaintiffs simply cannot be read to hold that the establishment clause is subordinate to the free exercise clause. The two religion clauses are aimed at separate evils. *Abington School District v. Schempp, supra.* The clauses must, therefore, be read together, with neither clause subordinate to the other. *Walz v. Tax Commission,* 397 U.S.

664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Governmental activity may not exceed the boundaries of either clause. *Wisconsin v. Yoder,* 406 U.S. 205, 220, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1971). Since a policy permitting religious services in the university's buildings would violate the establishment clause, plaintiffs' request for this Court to order the university to adopt that policy will be denied.

Plaintiffs make three additional arguments that must be considered. First, plaintiffs argue that the university's regulations act as a prior restraint against religious speech. Plaintiffs do not explain this argument, but this Court feels compelled to address the issues that may be lurking in its shadows. This argument is not unlike the one made by plaintiffs in connection with their free exercise theory. Essentially, they argue that the establishment clause must yield to the freedom of speech clause of the first amendment. This Court is convinced that this argument has been rejected by the Supreme Court.

In *Abington School District v. Schempp, supra,* the Court was presented with an establishment clause challenge to daily Bible readings conducted by students and teachers in Pennsylvania's public schools. The Supreme Court upheld a lower court order that enjoined the Bible readings. There exists no doubt that students' and teachers' rights to freedom of speech are protected by the first and fourteenth amendments. *Tinker v. Des Moines School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In *Abington School District v. Schempp, supra,* however, the Court did not even discuss the effect of its decision on the students' and teachers' free speech rights. That omission is explained by the Court's distinction between "secular intellectual liberties" and "religious activity." *Abington School District v. Schempp, supra,* 374 U.S. at 219, 83 S.Ct. 1560. In short, speech with religious content cannot be treated the same as any other form of speech. To do so would make a nullity of both the establishment clause and the free exercise clause of the first amendment.

■ Next, plaintiffs argue that the university's policy of making the University Center (student union) available to student groups for all purposes except religious purposes denies plaintiffs equal protection of the laws. In support of that argument, plaintiffs cite *Fowler v. Rhode Island,* 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953) (hereinafter *Fowler*). That case involved a city ordinance that was construed to prohibit a group of Jehovah's Witnesses from conducting religious services in a public park. That case must be distinguished from the one before this Court for two reasons. First, the parties in that case conceded that the ordinance in question had been construed to permit Catholics and Protestants to hold their religious services in the park. Thus, the application of the ordinance to Jehovah's Witnesses resulted in discrimination against the Jehovah's Witnesses as a religious group. There is, however, absolutely no evidence in this case that other religious groups at the university are treated more favorably than the plaintiffs in this action. Second, the *Fowler* case involved the use of a public park, not a public building. This Court is convinced that, for purposes of the religion clauses, a distinction must be drawn between public parks, sidewalks and streets on the one hand, and public buildings on the other. That distinction was recognized in *Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). The question before the Court in that case was whether a Jehovah's Witness could be barred from preaching over a loud speaker in a public park. The Court upheld the use of the loud speakers. In dissent, Justice Jackson took the position that the use of the public park for religious services violated the establishment clause of the first amendment. *Saia v. New York, supra* at 569–70, 68 S.Ct. 1148. Justice Jackson reasoned that the Court's holding in *McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), that the use of a public building for religious services violated the establishment clause, controlled the question of use of a public park for religious services. *Saia v. New York, supra* 334 U.S. at 569–70, 68 S.Ct. 1148. The majority of the Court rejected that position:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Saia v. New York, supra* at 561 n. 2, 68 S.Ct. at 1150 n. 2. That view has consistently been upheld by the federal courts. It was most recently applied to permit Pope John Paul II to conduct a public Mass on the Washington Mall in Washington, D. C. *O'Hair v. Andrus,* —— U.S.App.D.C. ——, 613 F.2d 931 (D.C.Cir.1979). Thus, if the university's regulations were being applied to prohibit plaintiffs from conducting religious services on the grounds, side walks, or streets of the university, plaintiffs' equal protection argument would have some force. In this case, however, plaintiffs' complaint challenges only the denial of the use of university-owned buildings for religious services. As discussed above, since such use would violate the establishment clause, this Court declines to order the university to permit the use of its buildings for religious services.

■ Finally, plaintiffs argue that, since the university's regulations could be construed to prohibit activities such as classroom discussion of theology, invocations at university functions, and private discussions between individuals, the regulations must, therefore, be struck down as vague and

overbroad. This Court is unconvinced by that argument. First, the university's regulation bars only "religious worship or religious teaching." Those phrases are virtually identical to the language in the Congressional enactment upheld in *Tilton v. Richardson, supra.* Second, plaintiffs candidly admit that the meetings they wish to hold in the university's buildings include regular religious worship services. The university's regulations have been appropriately interpreted to deny the use of university buildings for those services. There is absolutely no suggestion in the parties' pleadings or stipulations that the regulations have ever been used to bar activities protected by the first amendment. More importantly, plaintiffs have failed to present any evidence that the exercise of their first amendment rights have been chilled, in any way, by the existence of the university's regulations. The regulations include no threat of punishment, *Thornhill v. Alabama,* 310 U.S. 88, 101–102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), nor, as far as this Court knows, have they ever been applied to activities other than regular religious worship services. On these facts, therefore, this Court finds plaintiffs' vagueness argument to be without merit.

For the reasons set forth above, it is

ORDERED that defendants' motion for summary judgment, filed May 16, 1978, be, and hereby is, granted; and it is

ORDERED that plaintiffs' motion for summary judgment, filed May 26, 1978, be, and hereby is, denied.