**GANNETT SATELLITE INFORMATION NETWORK, INC. d/b/a USA Today, Plaintiff,**

**v.**

**Stephen BERGER, et al., Defendants.**

**Civ. A. No. 87–4495.**

United States District Court, D. New Jersey.

July 6, 1989.

Robb M. Jones and J. Gregory Bishop, Nixon, Hargrave, Devans & Doyle, Washington, D.C., and Richard A. Ragsdale, Strauss & Hall, Princeton, N.J., for plaintiff.

Donald F. Burke, Arnold D. Kolikoff and Hugh H. Welsh, Jersey City, N.J., for defendants Stephen Berger, Robert J. Aaronson, Morris Sloane and Vincent Bonaventura.

William H. Boice and R. Scott Tewes, Kilpatrick & Cody, Atlanta, Ga., and Richard M. Eittreim, Mc Carter & English, Newark, N.J., for Airline defendants.

## OPINION

POLITAN, District Judge.

This is a suit to determine whether plaintiff Gannett Satellite Information Network, Inc. ("Gannett") has a constitutional right to install newspaper vending machines for the distribution of newspapers within the passenger terminals of Newark International Airport, without the consent of the defendants, the Port Authority of New York & New Jersey ("Port Authority") or the airlines leasing space at Newark Airport.[1] Plaintiff seeks declaratory and injunctive relief on the grounds that the defendants' refusal to permit newspaper vending machines to be installed at the airport violates plaintiff's First Amendment right to free speech, its Fourteenth Amendment right of due process, its Four-

1. The airlines leasing space include American Airlines, Inc., Northwest Airlines, Inc., Piedmont Aviation, Inc., United Airlines, Inc., TransWorld Airlines, Inc., Delta Airlines, Inc., US Air, Inc., Continental Airlines, Inc., New York Airlines, Inc., and Eastern Airlines, Inc. At trial, these airlines as a group were represented by one attorney. Collectively, they are referred to as "the airline defendants".

teenth Amendment right of equal protection, and the right to free speech secured by Article One, paragraph 6 of the New Jersey Constitution.[2]

Plaintiff Gannett, a Delaware corporation with its principal office and place of business in Arlington, Virginia, publishes the nationally circulated newspaper known as USA TODAY. Defendant Port Authority is an agency created in 1921 by the States of New Jersey and New York by a congressionally consented to to compact. Newark International Airport is among the thirty-three facilities owned or operated by the Port Authority. Additional parties named as defendants in the complaint include the airline defendants, several directors and managers of Port Authority, and a corporation which previously held a lease to operate concession stands in the airport terminals.

## I. FACTS

Newark Airport occupies 23,000 acres of public land located within the Cities of Newark and Elizabeth, New Jersey. The entire airport facility consists of four passenger terminals, numerous administrative and commercial buildings, public and private parking lots, and a number of streets, sidewalks and roadways. The three principal passenger terminals at Newark Airport are known as Terminals A, B and C. Another terminal, the North Terminal, is no longer fully operational. Although the airport complex is surrounded by security fences, under normal circumstances any member of the public can gain access to non-secure areas on a 24 hour a day basis. Airport patrons and employees gain access to Newark Airport from interchanges off the New Jersey Turnpike and other major highways.

In 1985 an estimated 28.5 million airline passengers travelled through Newark Airport, making it the eighth busiest airport in the world that year. In 1987 approximately 23.5 million passengers travelled through the airport. Within the next 10 to 15 years the airport is expected to handle 45 to 50 million travelers annually. In addition to airline passengers, the Port Authority defendants estimate that the number of non-passengers at Newark Airport is 22.5% of the number of passengers. On a daily basis then, the average population of passengers and other members of the public at Newark Airport for 1985 and 1987 was 79,000 to 95,000. In general, these airport visitors have unrestricted access to the public circulation areas of the passenger terminals. They are free to walk, sit, shop or dine at the various commercial establishments located throughout the terminals.

In terms of design, Terminals A and B are almost identical. Each terminal has three passenger service levels. The uppermost level is the departure level; the lowest level is the arrivals level; the middle level is the concourse level, where many of the shops and public facilities in the passenger terminal are located. There are passageways that lead from the concourse level of the main terminal buildings to each of three flight stations which contain the various aircraft gates where passengers enter and exit. Defendants have placed security check points close to the entrance of these passageways.

Terminal C is similar to Terminals A & B except that instead of three flight stations where the aircraft gates are located, there are three corridors or concourses. Aircraft gates, hold areas, shops, restaurants and other services are located along two of these three corridors. The remaining corridor contains facilities for the U.S. Customs Service and Immigration and Naturalization Service operations.

The Port Authority leases two-thirds of the land occupied by Newark Airport from

---

**2.** A violation of constitutional rights can occur only through the actions of a government entity. It is not disputed by the parties that the Port Authority is a state actor and therefore, the provisions of the Constitution apply to its decision to regulate the placement of newsracks at the airport. However, application of constitutional provisions to the airline defendants requires this Court to conclude that the airline defendants are also state actors. Consideration of this issue was deferred until after trial of the First Amendment case. In light of this Court's holding, the state action issue is moot.

the City of Newark under a long-term lease. The remainder of the land (*i.e.*, that part located in the City of Elizabeth) is owned directly by the Port Authority. The Port Authority, in turn, leases space within the airport terminals to the airline defendants under long-term lease agreements. Space in Terminals A and B is leased by a number of different airlines. Only Continental Airlines leases space in Terminal C. The terms of these lease agreements are substantially similar. Airlines lease terminal space in relation to other airlines on either an exclusive or non-exclusive basis. In addition, the leases reserve part of the terminal premises for "public circulation areas". These areas include space controlled solely by the Port Authority as well as exclusive or non-exclusive airline space and are reserved specifically for use by airline patrons, passengers, business visitors and the general public.

The majority of available space in the airport terminals is leased to the airline defendants. However, the Port Authority reserves the right to lease space in certain designated areas to independent concessionaires. The right to select these concessionaires is retained by the Port Authority, who negotiates the agreements, sets fees, and monitors operations. In practice, however, the selection of concessionaires is a joint decision requiring approval of both the Port Authority and the airline defendants. Under the terms of the lease, concessionaires have an exclusive or semi-exclusive right to sell various merchandise including newspapers in a particular terminal. For this right, the concessionaires pay a fixed base rent plus approximately 17½ percent of their gross sales. These lease payments from the concessionaires are shared between the Port Authority and the airline defendants.

The Port Authority retains ultimate control over all terminal space through "use provisions" and other clauses in its lease agreements. These provisions carefully enumerate all of the permitted uses for the leased space. The Port Authority reserves the right to grant or deny a lessee permission for a proposed use outside of those enumerated. In addition, all leases at the airport are subject to those Port Authority Rules and Regulations applicable to airport operations.

Under these Rules and Regulations, the Port Authority is vested with the authority to make decisions concerning the types of written material that may be distributed at Newark Airport independent of the concessionaires, and under what circumstances such distribution may occur. In 1987 the Rules and Regulations relevant to this case, stated in part:

> No person shall carry on any commercial activity in any air terminal, other than aircraft operation, without the consent of the Port Authority.

> \*  \*  \*  \*  \*  \*

> No person shall post, distribute or display signs, advertisements, circulares, printed or written matter at any air terminal without permission.

Airport Rules and Regulations, Ch. III §§ 2, 9 (Plaintiff's Exhibit 55).

Port Authority publications regarding services, ground transportation, and other airport matters currently are available free of charge in display racks located throughout the terminal. Sources other than the Port Authority also distribute pamphlets and brochures free of charge from numerous display racks. Among the publications available are brochures printed by the N.J. Department of Tourism and two free newspapers, The Leisure Town Crier and the Leisure Life News, both published by Leisure Technology Corporation.

On February 5, 1987 plaintiff wrote a letter to the Port Authority proposing the placement of thirty-four newsracks at specific locations in Newark Airport, with six additional newsrack locations for Terminal C after renovations were completed. Subsequent correspondence was exchanged and meetings were held to discuss plaintiff's proposals. On October 14, 1987, a representative of Port Authority indicated, by letter to plaintiff's counsel, that they "ha[d] reached the conclusion that the distribution of USA TODAY [was] adequately served by newsstands" and that "the use of newsracks ... would not serve the best

interests of the [Port Authority] Airports."[3] On November 12, 1987, plaintiff initiated the action currently before this Court.

Subsequent to the commencement of this suit, the Port Authority amended the Rules and Regulations to create separate provisions for regulation of commercial and non-commercial activity within the airport terminals. The prohibition of commercial activity without the consent of the Port Authority provides:

> No person shall carry on any commercial activity at any air terminal without the consent of the Port Authority.

Revision of Airport Rules and Regulations, Ch. III § A.2 (Plaintiff's Exhibit 56).

The prohibition against distribution of written materials was amended to provide:

> No person shall post, distribute or display at an air terminal a sign, advertisement, circular, or any printed or written matter concerning or referring to commercial activity, except pursuant to a written agreement with the Port Authority specifying the time, place and manner of, and fee or rental for, such activity.

*Id.* at Ch. III § A.10.

In addition, a new regulation adopted on February 11, 1988, prohibiting the placement of vending machines in the Port Authority airports states:

> No vending machines for the sale of goods shall be permitted in the public areas of Kennedy International, Newark International and LaGuardia Airports, which are not occupied by a lessee, licensee or permittee. This prohibition shall not apply to vending machines in rest rooms selling personal hygiene items.

*Id.* at Ch. III § A.3.

This new prohibition only applies to Port Authority controlled space. It does not apply to airline leased space. In addition, it does not bar existing vending machines located in concession areas, nor does it cover those vending machines located in the terminal used to sell services. This absolute prohibition on vending machines for the sale of goods serves as an additional bar to the placement of plaintiff's newsracks within the public areas of the airports.

## II. FACIAL ATTACK

Plaintiff alleges that the Port Authority Rules and Regulations at issue in this case violate the Constitution because these rules delegate to public officials unfettered discretion to grant or deny permission to exercise First Amendment rights in a public forum. Plaintiff also maintains that the decision banning newsracks constitutes an unconstitutional prior restraint on the distribution of newspapers.

Defendants, on the other hand, argue that these regulations represent a general commercial scheme requiring the sale of goods and services in the terminals only through authorized concessionaires. Because the regulations are not directed narrowly and specifically at the distribution of newspapers, defendants contend that the regulations cannot be subject to a facial challenge as a prior restraint.

A long history of Supreme Court cases has held that a licensing statute placing unbridled discretion in the hands of a government official to permit or deny expressive activity is an unconstitutional prior restraint and may result in censorship. *See, e.g., Shuttlesworth v. Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969); *Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965); *Cox v. Louisiana,* 379 U.S. 536, 557, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965); *Kunz v. New York,* 340 U.S. 290, 293, 71 S.Ct. 312, 314, 95 L.Ed. 280 (1951); *Saia v. New York,* 334 U.S. 558, 560–62, 68 S.Ct. 1148, 1149–51, 92 L.Ed. 1574 (1948); *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940). In each of these cases, the plaintiff sought to engage in expressive activity in a public forum and was denied access pursuant to an ordinance requiring the prior

---

**3.** Although the airline defendants were not consulted in this decision, they have taken the position, once joined in this litigation, that the Port Authority defendant's decision was an appropriate one.

approval of a government official. That official had authority, under the terms of the ordinance, to grant or deny permission to engage in the expressive activity without the benefit of neutral criteria to guide the decision-making process. In each case, the Supreme Court found that the ordinance acted as an unconstitutional prior restraint of protected First Amendment activity. In some cases, the Court allowed a facial challenge even though the plaintiff had not applied for a license. *See, e.g., Freedman,* 380 U.S. at 56, 85 S.Ct. at 737; *Shuttlesworth,* 394 U.S. at 151, 89 S.Ct. at 939. Permitting a facial attack, however, is contrary to the Court's normal approach which has been to determine whether a law is unconstitutional "as applied" to the particular facts before the Court. *See, e.g., Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 501–03, 105 S.Ct. 2794, 2800–02, 86 L.Ed.2d 394 (1985); *United States v. Grace,* 461 U.S. 171, 175, 103 S.Ct. 1702, 1705, 75 L.Ed.2d 736 (1983); *Nixon v. Administrator of General Services,* 433 U.S. 425, 438–39, 97 S.Ct. 2777, 2787–88, 53 L.Ed.2d 867 (1977).

Recently, the Supreme Court considered when a facial challenge to an alleged prior restraint was appropriate. In *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Supreme Court concluded that a facial attack could be maintained "whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." 108 S.Ct. at 2145. The Court, however, limited the reach of this broad policy, stating

> [t]hat is not to say that the press or a speaker may challenge as censorship any law involving discretion to which it is subject. The law must have a close enough nexus to expression, or to conduct commonly associated with expres-

sion, to pose a real and substantial threat of the identified censorship risks. *Id.*[4]

In *Lakewood,* the ordinance at issue vested the Mayor with ultimate authority to grant or deny applications for annual permits to place newsracks on public property. If the application was denied, the Mayor was required to state reasons for the denial. If the application was granted, a permit would issue subject to conditions expressed in the ordinance and imposed by the Mayor in his discretion. On these facts, the Court held that a facial challenge was appropriate because the annual licensing system was directed narrowly and specifically at expressive activity, imposed a continuous risk of censorship and could be used to suppress expressive activity without further review of the official's determination. *See* 108 S.Ct. at 2145. Because of the absence of neutral guidelines in the ordinance, the Court declared as unconstitutional those portions granting the Mayor unfettered discretion to permit or deny an application. *See* 108 S.Ct. at 2152.

The instant case presents a factual posture significantly different from the long line of Supreme Court cases, culminating in *Lakewood,* which permitted facial attacks of an ordinance delegating substantial discretion to a government official. This Court has before it three regulations which, by their express terms, are directed at all commercial activity in the airport terminals. Each provision represents an attempt by the Port Authority to regulate commercial activity within the airport terminals consistent with the demands of limited space, the risks inherent in air travel, and the desire to provide safe and efficient operations. Since the scope and primary thrust of these regulations is directed toward commercial activity having nothing to do with the First Amendment, the regulations on their face are not directed narrowly and specifically at expressive activity and do not, *per se,* create a threat of cen-

---

**4.** The Court identified the two major First Amendment risks associated with unbridled licensing schemes as "self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, revealing and correcting content based censorship 'as applied' without standards by which to measure the licensor's actions." 108 S.Ct. at 2145.

sorship or the impact of a suppression of expressive activity without further review. As such, a facial attack on these regulations is not the appropriate constitutional challenge.[5]  As the Court in *Lakewood* recognized,

> laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression, or the words about to be spoken, carry with them little danger of censorship.... [S]uch laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse.

108 S.Ct. at 2146.

While it is true that these commercial regulations may, in some instances, have an impact in the First Amendment area, the Court should not, under the guise of First Amendment protection or analysis, strike down, in a sweeping fashion, a valid commercial regulation.  Adequate alternative safeguards are available since such a regulation can be constitutionally scrutinized and tested as it is applied in a particular factual setting.  The constitutional safeguards of the First Amendment are no more or no less stringent in an "as applied" setting.  Since the Port Authority has, in applying its commercial regulations, barred the use of newsracks, this Court must consider whether some interest, unrelated to speech, justifies the defendant's actions. In conducting this inquiry, the Court must apply traditional concepts of First Amendment analysis.

### III.  FIRST AMENDMENT ANALYSIS

It is well established that the First Amendment guarantees of freedom of the press and freedom of speech protect the distribution and circulation of a newspaper.

In *Lovell v. City of Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), the Supreme Court emphasized that "liberty of circulating is as essential to freedom of the press as liberty of publishing; indeed, without the circulation, the publication would be of little value."  *Id.* at 452, 58 S.Ct. at 669.  It does not matter that the dissemination of a First Amendment publication takes place under commercial auspices. *See Smith v. California*, 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959);  *see also Pittsburgh Press Co. v. Human Relations Commission*, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973). The constitutional protection accorded written material does not change merely because it is sold rather than given away. *See Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981).

Without question, distribution of plaintiff's newspaper is protected by the First Amendment.  *See Lovell*, 303 U.S. at 452, 58 S.Ct. at 669.  In addition, it has been held, in a variety of factual settings, that the right to distribute newspapers by means of newsracks also falls within the ambit of First Amendment protections. *See, e.g., Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767, 772 (2nd Cir.1984); *Miami Herald Publishing Company v. City of Hallandale*, 734 F.2d 666, 673 (11th Cir.1984);  *Chicago Newspaper Publishers Ass'n v. City of Wheaton*, 697 F.Supp. 1464, 1466 (N.D.Ill.1988);  *Providence Journal Co. v. City of Newport*, 665 F.Supp. 107, 110 (D.R.I.1987); *Southern New Jersey Newspapers v. New Jersey Department of Transportation*, 542 F.Supp. 173, 183 (D.N.J.1982); *Passaic Daily News v. City of Clifton*, 200 N.J.Super. 468, 473, 491 A.2d 808 (Law Div.1985). *But see, City of Lakewood v. Plain Dealer*

---

**5.** The dissenting Justices in *Lakewood,* in contrast to the majority, would have permitted only a limited opportunity to maintain a facial challenge of an ordinance alleged to be unconstitutional.  Specifically, the dissent stated "[t]he doctrine ... applies *only* when the specific conduct which the [government] seeks to license is protected by the First Amendment."  108 S.Ct.

at 2153 (emphasis added).  Because I have concluded that, in this case, the distribution of newspapers by newsracks in the airport is not protected by the First Amendment, *see infra, a fortiori,* a facial attack also would not be permitted under the rationale of the dissenting Justices in *Lakewood.*

*Pub. Co.*, —— U.S. ——, 108 S.Ct. 2138, 2155, 100 L.Ed.2d 771 (White, J., dissenting). It is, however, clear to this Court that the First Amendment protections afforded to newsracks are not boundless. A fact-oriented analysis and close scrutiny of the reasons expressed by the defendants for refusing to permit that form of distribution is necessary. Placing the facts of this case in juxtaposition to the facts in the above cited cases, and applying the accepted First Amendment rationales, this Court concludes that the prohibition against newsracks in the airports does not constitute a violation of plaintiff's First Amendment rights.

The original cases providing the basis for the conclusion that newsracks are protected by the First Amendment present only cursory treatment of the legal questions raised. In *Philadelphia News, Inc. v. Borough Council, etc., of Swarthmore*, 381 F.Supp. 228 (E.D.Pa.1974), the Court concluded that "newspaper vending boxes or machines along public streets and sidewalks are a constitutionally protected means of distribution...." *Id.* at 241. In reaching this conclusion, the Court set out the holding of two prior state court decisions addressing a similar factual situation—a municipal ordinance regulating the placement of newsracks on public streets.[6] Without discussing the issue further, the Court agreed with the holdings of these two cases and voided the ordinance "insofar as it applied to condition the placement of newspaper boxes on public sidewalk[s]...." *Id.*

In a subsequent case, *Southern New Jersey Newspapers v. New Jersey Department of Transportation*, 542 F.Supp. 173 (D.N.J.1982), this Court was presented with a New Jersey statute used to prohibit the maintenance of newsracks within the public rights-of-way throughout the state. The Court held that the statute was "unconstitutional as applied to prohibit totally the erection or maintenance of [newsracks] within the [public] right-of-way...." 542 F.Supp. at 187. In reaching this conclusion, the Court found, "[i]n that [newsracks] pay a role in the distribution of plaintiff's newspapers, this court agrees with the position that such devices are entitled to full constitutional protection." *Id.* at 183 (citations omitted). Again, the acceptance and application of this principle was made without further discussion.[7]

Later cases have also adopted the finding that newsracks are protected by the First Amendment. *See, e.g., Miami Herald Publishing*, 734 F.2d at 673; *Chicago Newspaper Publishers*, 697 F.Supp. at 1466; *Providence Journal*, 665 F.Supp. at 110; *Passaic Daily News*, 200 N.J.Super. at 473, 491 A.2d 808. In each case of these cases, the government entity sought to regulate the placement of newsracks on a public street or sidewalk. By enacting the specific ordinance, the government effectively prohibited adequate access to the public forum to distribute newspapers. Under the facts presented by these cases, distribution by newsracks served as the only adequate means of distribution in the

---

**6.** In *Gannett Co. v. City of Rochester,* 69 Misc.2d 619, 330 N.Y.S.2d 648 (Sup.Ct.1972), the City of Rochester enacted an ordinance which required a permit to maintain a vending machine or any other structure for the sale of newspapers on any public sidewalk. The Court concluded that the ordinance was unconstitutional, in part because it was too broad and had the effect of regulating an important means of distribution. *Id.* 330 N.Y.S.2d at 653–55. In reaching this conclusion, the Court continually stressed the convenience of distribution these machines provided. *Id.* 330 N.Y.S.2d at 654–55, 659.

In *Remer v. City of El Cajon,* 52 Cal.App.3d 441, 125 Cal.Rptr. 116 (Sup.Ct.1975), the Court considered an ordinance which made it unlawful to place newsracks on any public street or

sidewalk. The Court concluded that the total prohibition on newsracks was overbroad and unconstitutional on its face. *See id.* at 444, 125 Cal.Rptr. at 119–20. The court noted that "[n]ewspaper vending boxes along public streets are a constitutionally protected means of distribution." *Id.* at 443, 125 Cal.Rptr. at 117.

**7.** The Court did mention, in a later discussion, that "the public's right of access to newspapers is also implicated and must be considered in any determination." 542 F.Supp. at 185 n. 23. This is an important consideration relevant to distribution of newspapers. It does not appear, however, that this point formed part of the basis for the Court's holding that newsracks are absolutely protected by the First Amendment.

public forum.[8]

■ This is not a case where there is a total prohibition of newspaper distribution. Nor is this a case where the only method of distribution is by newsracks. At the airport, newsracks are merely an additional manner of distribution duplicating services already available through Port Authority licensed concessionaires. Addition of these machines serves only the economic interests of publishers and the convenience of the public. It may be that newspaper distributors can sell more newspapers by placing their newsracks in public areas. However, those seeking to distribute more newspapers cannot use the absolute protection of the First Amendment to guarantee additional sales. I do not suggest that distribution by newsracks is never a protected means of distribution. But when the placement of newsracks merely serves as an additional, more desirable manner of distribution, the absolute protection of the First Amendment is not available.

As an additional manner of distribution at the airport, the use of newsracks may be regulated or prohibited, provided the regulation does not contravene rights guaranteed by the First Amendment. In an appropriate case, a reasonable regulation which includes the prohibition of newsracks is permissible. To make this determination, the first required analytical step is to classify the type of forum in which the actor seeks to assert its First Amendment right. Depending upon the resolution of this issue, different First Amendment standards apply.

The Supreme Court has recognized three distinct types of fora: the traditional public forum; the designated public forum; and the non-public forum. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985). A traditional public forum is a place which by long tradition has been devoted to assembly of the public, communication of ideas, and debate of public questions. *See id.* at 802, 105 S.Ct. at 3449. Streets and parks are considered the quintessential traditional public fora because these places have a long tradition of public assembly and debate. *See Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). If the property is a traditional public forum, the government's right to regulate First Amendment activity is sharply circumscribed. A total prohibition of First Amendment activity must be based on a compelling state interest and narrowly tailored to promote that interest. In addition, a time, place and manner restriction is permitted if it is content neutral, is narrowly tailored to advance a significant state interest, and provides adequate alternative means for First Amendment expression. *See Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

A designated public forum shares many characteristics of a traditional public forum, but is a place which traditionally has not been open to the general public for communicative activities. In general, a designated public forum is property which the state has opened to the public as a place for limited communication by certain speakers for the discussion of certain subjects. *See Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449. Municipal auditoriums and theaters are considered designated public fora. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). The state is not required to indefinitely retain the open character of a designated public forum; however, as long as it does so, it is bound by the same standards as apply to a traditional public forum. *See Perry*, 460 U.S. at 46, 103 S.Ct. at 955.

**8.** Several courts have noted that private sources of distribution (e.g. retail stores along city streets) do not constitute adequate alternative channels of communication for purposes of First Amendment analysis. *See Chicago Newspaper Publishers*, 697 F.Supp. at 1470; *Providence Journal*, 665 F.Supp. at 117–18. "[I]f private sellers are an adequate alternative channel under the Constitution, then an ordinance which is constitutional today becomes unconstitutional tomorrow, when those sellers close, relocate, or elect not to sell newspapers. The protections of the First Amendment cannot be so transitory." 697 F.Supp. at 1470.

A non-public forum is property which is not by tradition or designation a place for public assembly and communication. A public school's internal mail system is a non-public forum. *See id.* Implicit in the characterization of property as a non-public forum is the right to limit access on the basis of subject matter and speaker identity. *See id.* at 49, 103 S.Ct. at 957. If property is characterized as a non-public forum, a regulation is permitted so long as it is reasonable and does not reflect an attempt to suppress a particular viewpoint. *See id.; U.S. Southwest Africa/Namibia Trade & Cultural Council v. U.S.,* 708 F.2d 760, 763 (D.C.Cir.1983).

Plaintiff maintains that Newark International Airport is a public forum because it is closely analogous in character and pattern of activity to streets, parks and other traditional public fora.[9] Therefore, plaintiff argues that the terminals should receive identical treatment under the First Amendment. Defendants, on the other hand, contend that such a characterization ignores the special nature of an airport as a place for the efficient and convenient movement of airline passengers. Because the airport's sole purpose is the facilitation of travel, and does not serve as a place for the communication of ideas by the public, defendants maintain that an airport should not be considered a public forum.

It is now generally accepted among lower federal courts that airport terminals owned and administered by governmental entities are public fora in which efforts to regulate speech or religious activities must comport with First Amendment guarantees.[10] *See, e.g., Jamison v. City of St. Louis,* 828 F.2d 1280, 1283 (8th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1289, 99 L.Ed.2d 499 (1988); *U.S. Southwest Af-*

*rica/Namibia,* 708 F.2d at 766; *Fernandes v. Limmer,* 663 F.2d 619, 627 (5th Cir. 1981), *cert. denied,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982); *Rosen v. Port of Portland,* 641 F.2d 1243, 1245–46 (9th Cir. 1981); *International Society for Krishna Consciousness v. Rochford,* 585 F.2d 263, 272 (7th Cir.1978); *Chicago Area Military Project v. City of Chicago,* 508 F.2d 921 (7th Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 4 L.Ed.2d 483 (1975); *Kuszynski v. City of Oakland,* 479 F.2d 1130, 1131 (9th Cir.1973). The Fifth Circuit, finding that the Dallas/Fort Worth Airport is a public forum, stated "the parallel between public streets and the central concourses of the airport buildings, where travelers as well as the general public may shop, dine, imbibe, and site see, is clear and powerful." *Fernandes,* 663 F.2d at 627. The Seventh Circuit reached the same conclusion in *Chicago Area Military Project.* In that case, the Court concluded that "the spacious, city-owned common areas of the airport resembled those public thoroughfares which have long been recognized to be particularly appropriate places for the exercise of constitutionally protected rights to communicate ideas and information." 508 F.2d at 925. There is nothing that has been presented to this Court regarding Newark International Airport that would distinguish it from any other airport that has been held to be a public forum. Therefore, the Court concludes that Newark Airport is a public forum.[11]

A review of prior case law, however, indicates that airports are not viewed as serving the same function as streets and sidewalks, nor that they are identical in all respects. Rather, courts draw on the analogy that airports and streets are both natural gathering places for people with an

---

**9.** Plaintiff argues that an airport terminal is the twentieth century equivalent of the city gate, which has been recognized since biblical times as a place where ideas are exchanged and public declarations made. *See, e.g.,* Joshua 20:14; Proverbs 1:20–21.

**10.** It should be noted that the Supreme Court has yet to address the issue of how a government-owned airport is to be characterized. *See Board of Airport Commissioners v. Jews for Je-*

*sus, Inc.,* 482 U.S. 569, 573–74, 107 S.Ct. 2568, 2571–72, 96 L.Ed.2d 500.

**11.** Of course, this conclusion does not apply to non-public areas at the airport. These areas retain the characterization of non-public fora. A facility may contain some areas to which equivalent public access is not guaranteed by the Constitution. *See Perry,* 460 U.S. at 44, 103 S.Ct. at 954.

interest and expectation that certain types of public activity are permitted and in fact will take place. However, there are several differences in the function and operation of an airport facility that distinguishes it from streets, sidewalks and other traditional public fora. Initially, the airport lacks a long tradition of devotion to assembly of the public, the communication of ideas and the openness to public debate common to all traditional public fora. In addition, there is a limited amount of space to which the airport must confine its operations for the purposes of air travel. There are also various safety hazards and security risks inherent in the nature of air travel and mass transportation that must be considered for the effective and efficient execution of operations. Moreover, while the Port Authority retains title to all land and improvements at the airport facilities, the day-to-day operations at the airport are executed jointly by the Port Authority and the private airlines leasing the space for commercial purposes. While these differences do not remove the airport facility from its status as a public forum, the Court must, in evaluating the regulations as applied, take into account the unique nature of the facility and bear in mind that the airport's principal function is to provide for the efficient and convenient movement of passengers and air travel. Scrutiny of the regulations within this framework cannot be accomplished by slavish adherence to, and blind application of First Amendment generalized language. The Court must recognize the subtle differences and competing interests that are necessarily called into play in analyzing newsracks in the street as compared to an airport. With these factual differences in mind, the Court will proceed to an analysis of First Amendment activities within a public forum.

■ In a public forum, the government may regulate First Amendment activity only by imposing time, place and manner regulations which are content neutral; are narrowly tailored to serve significant state interests; and leave open adequate alternative channels of communication. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065,

3069, 82 L.Ed.2d 221 (1984); *Perry*, 460 U.S. at 45, 103 S.Ct. at 954. The Supreme Court has emphasized the need for "a particularized inquiry into the nature of the interest at stake." *Metromedia Inc. v. City of San Diego*, 453 U.S. 490, 503, 101 S.Ct. 2882, 2890, 69 L.Ed.2d 800 (1981). "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). In conducting this inquiry, the Court is not limited to considering only the proposed activity of plaintiff; the Court may include in its analysis the effect of allowing all individuals access to the particular forum to engage in First Amendment activity on the same terms as plaintiff. *See American Future Systems, Inc. v. Penn. State University*, 752 F.2d 854, 865 (3d Cir.1984), cert. denied sub nom., 473 U.S. 911, 105 S.Ct. 3537, 87 L.Ed.2d 660 (1985); *see also Heffron*, 452 U.S. at 654, 101 S.Ct. at 2567.

■ In this case, defendants' imposed a ban on the use of newsracks in the airport terminals. All commercial newspapers are prohibited from using newsracks as a manner of distribution. The prohibition, therefore, is content-neutral.

Defendants articulate several reasons to support its assertion that its refusal to permit the placement of newsracks at the airport comprehends a valid governmental interest: reduction of revenues raised from lease agreements; public safety; elimination of increased security risks; aesthetic concerns; and, a general interest in effective operation and maintenance procedures. The Supreme Court and other federal courts have recognized that these concerns are legitimate and substantial government interests. *See Clark*, 468 U.S. at 296, 104 S.Ct. at 3070 (interest in physical maintenance and aesthetics); *Members of City Council v. Tax Payers for Vincent*, 466 U.S. 789, 798, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984) (interest in aesthetics); *Heffron*, 452 U.S. at 650–51, 101 S.Ct. at 2565–66 (interest in safety, congestion and convenience); *Metromedia*, 453 U.S. at 490,

507–508, 101 S.Ct. at 2882, 2892–93 (aesthetics); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 305, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974) (interest in revenue); *International Society for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Authority,* 691 F.2d 155, 162 (3d Cir.1982) (interest in congestion and revenue). *See also Lakewood,* 108 S.Ct. at 2157 (White, J., dissenting) (interest in preventing physical encroachment of street, safety and aesthetics).

■ Asserting a substantial government interest, however, is not enough. A valid time, place and manner restriction must also "serve" that substantial government interest. *See New Jersey Citizen Action v. Edison Twp.,* 797 F.2d 1250, 1256 (3d Cir.1986), *cert. denied sub nom.,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 186 (1987). Thus each proffered interest must be examined factually to determine the extent to which, if at all, the regulation serves or promotes that interest.

### 1. Revenue Raising

Defendants claim that the newsracks will divert newspaper sales from newsstands resulting in lower revenues from newspaper sales and other related items sold at concession stands throughout the airport. A reduction in newsstand sales causes a reduction of the total amount of revenue raised pursuant to lease agreements with the various concessionaires. The Third Circuit has upheld a ban on expressive activity based in part on the state's legitimate interest in raising revenue. *See Sports Authority,* 691 F.2d at 161–62.[12] In that case, the Court concluded that the proposed expressive activity (*i.e.,* solicitation of donations) would impinge on the State's interest in revenue raising to the extent that it would divert funds that might otherwise be spent at concession stands. *Id.* The Court noted that the state agency benefits from the sale of goods at concession stands because it receives a percent of the total amount spent by the public.

For similar reasons, the Second Circuit, in *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority,* 745 F.2d 767 (2d Cir.1984), concluded that "when a government agency is engaged in a commercial enterprise, the raising of revenue is a significant interest." *Id.* at 775. In that case, the Court considered whether the Transportation Authority could impose licensing fees and other conditions on the placement of newsracks in the Authority's commuter train stations. *Id.* at 770. The Court held that the Authority may restrict the right to distribute newspapers through newsracks in MTA stations by imposing licensing fees designed to raise revenue for the efficient operations of the commuter lines. *Id.* at 775. In reaching that holding, the Court noted that "the management of station facilities is a proprietary, not a governmental function." *Id.* at 774.

In this case, the primary purpose of the Port Authority at Newark Airport is to provide safe, efficient commercial air passage for the travelling public. By leasing terminal space to various commercial enterprises, the Port Authority, as owner and primary lease-holder of airport property, is able to raise revenues to support operations.[13] The Port Authority licenses several concessionaires to provide a variety of goods and services to the travelling public. This arrangement provides a centralized, orderly and efficient distribution of commercial goods within limited airport space. Concessionaires rely on the sale of newspapers and other related items to generate revenue. The average amount of revenue a concessionaire earns per enplaned passenger at Newark Airport is approximately $.93. Under the terms of the lease agreements, the defendants receive approximately 17½ percent of the revenue generated on

---

12. The Third Circuit characterized the Meadowlands Sports Complex as "a commercial venture by the state ... not intended to be a public forum." 691 F.2d at 161. While the nature of the Meadowlands is different from the forum in this case, the rationale established to support the government's interest in raising revenue is instructive.

13. In 1987, approximately $2.2 million in general consumer services revenue went to support Port Authority operations at Newark Airport.

all concession sales. Pursuant to the lease agreements, then, the concessionaires' rental payments are approximately $.16 per enplaned passenger.

In recent years, other metropolitan airports have installed newsracks as an additional means of newspaper distribution. Evidence submitted at trial indicates that newsstand sales of plaintiff's newspaper at these airports has not kept pace with the increase in passenger enplanements. This situation is contrary to economic expectations. Any increase in passenger volume should result in a concomitant increase in newsstand sales. During this period, newsracks were installed at each airport. Newspaper sales by newsracks at these airports have been substantial. A logical conclusion, therefore, is that the installation of newsracks is a factor causing less than expected increases in newsstand sales.

A reduction in newsstand sales per enplaned passenger reduces the total revenue generated by a concessionaire. This, in turn, reduces the revenue available for airport operations.[14] Any reduction in expected revenues impinges on the defendants' ability to continue to service the primary purpose of the facility and the corresponding needs of the air-travelling public effectively and efficiently. If, as plaintiff suggests, concessionaires were to operate newsracks, a reduction in total revenue would still exist because of the lost sales on related goods and services also available at the newsstands. The prohibition on newsracks imposed by the defendants, therefore, maintains the revenue base upon which the defendants rely to finance operations.

### 2. Aesthetics

Defendants also assert an interest in maintaining the appearance of the airport terminals.[15] In this area, the question for the Court is whether the defendant's interest in aesthetics is "only a public rationalization of an impermissible purpose." *Metromedia*, 453 U.S. at 510, 101 S.Ct. at 2894; *see Gannett Satellite Information Network, Inc. v. Township of Pennsauken*, 709 F.Supp. 530, 538 (D.N.J.1989). In considering this interest, this Court notes that aesthetic concerns are more a function of context than a matter of absolute standards. *See Providence Journal*, 665 F.Supp. at 114. The impact of particular additions to a local environment will vary depending upon the type of additions proposed and the number of encroachments already in place. *See id.*

In *Southern New Jersey Newspapers*, 542 F.Supp. 173, this Court rejected the government's aesthetic rationale for a newsrack ban on populated city streets. *See id.* at 186. In reaching its conclusion, the court noted that many of the newsracks were to be located in "populated commercial areas where the boxes may even seem at home and not where the boxes might truly look out of place." *Id.* at 186–187.

In the instant case, the placement of newsracks is prohibited at an airport terminal, dramatically different from the cluttered city streets described in *Southern New Jersey Newspapers. See id.* at 186. It is hard to imagine that placement of plaintiff's newsracks throughout the airport, as well as those of numerous competitive newspapers, will not contribute to the "visual clutter" of the airport and detract from the overall physical appearance which airport personnel seek to maintain through maintenance and careful allocation of scarce space. The ban on newsracks in the airport, while not completely eliminating all visual clutter, acts as an appropriate means

---

**14.** This Court does not suggest that the defendants' sole source of revenue is from concessionaire rental payments. However, its importance cannot be ignored. One concessionaire, Retail Management, Inc., operating seven newsstands in Newark Airport, annually pays approximately $650,000.00 as a percent-of-profit fee.

**15.** Plaintiff notes the presence of other vending machines and objects in the airport terminals which contribute to visual clutter. However, the Supreme Court rejected such an argument in *Tax Payers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, and concluded that "even if some visual blight remains, a partial, content-neutral ban may nevertheless enhance the [property's] appearance." *Id.* at 807, 104 S.Ct. at 2130.

of maintaining the airport's physical appearance.[16]

There is nothing wrong with trying to make the airport aesthetically pleasing. All too many times beauty is sacrificed for utility. Moreover, in this case, there is no suggestion and the record is devoid of any proof that aesthetic concerns are pretextual and designed to hide a motive to suppress First Amendment rights.

### 3. Safety

Defendants also claim that the placement of newsracks will obstruct pedestrian traffic and may increase the risk of injury to pedestrians. Plaintiff concedes that these safety concerns are legitimate government interests, but maintains that the ban on newsracks is grossly under inclusive because it does not also exclude other obstructions located in public areas throughout the terminal. As previously noted, however, many of these additional objects are necessary for airport operations or provide additional services previously unavailable at the airport. Moreover, many of these objects are located in remote or uncrowded areas of the terminal. Newsracks do not fall into that category. Newsracks are not necessary to airport operations; the machines merely duplicate existing services of concessionaires. In addition, to insure the economic viability of plaintiff's newsracks and those of plaintiff's competitors, the newsracks would be placed in public areas with a high concentration of pedestrian traffic. Such an addition to areas with high pedestrian traffic obviously would increase safety hazards.

In these areas, a newsrack would obstruct the normal and efficient flow of traffic. A standard newsrack projects twenty inches into a passenger movement corridor. An object of this size reduces the pedestrian traffic flow capacity of the corridor by 42 people per minute.[17] A USA TODAY type newsrack, being used by a standing customer with the cabinet door fully extended, reduces pedestrian traffic flow capacity by 110 people per minute, without allowing for any baggage placed on the floor while the device is in use. This obstruction is multiplied many times over considering the additional newsracks that presumably would be placed in the same area by plaintiff's competitors.

The interruption in pedestrian traffic caused by the newsracks themselves and the continued use by the general public in high traffic areas results in a substantial decrease in corridor capacity and a concomitant decrease in passenger convenience. The defendants have a legitimate concern for managing the flow of traffic throughout the facility. *See Heffron*, 452 U.S. at 650–52, 101 S.Ct. at 2565–66. During peak travel periods or in emergency situations, maximum flow of pedestrian traffic is essential. A prohibition on newsracks in the airport terminals eliminates additional problems in managing the flow of pedestrian traffic and adequately serves the defendants' interest in safety.

### 4. Security

Defendants also argue that newsracks pose a security risk because the machines provide an additional place to conceal explosives. This complicates detection and removal procedures in the event of a bomb threat at the airport. Plaintiff states that any increased security risk is *de minimus* because no explosive devices have ever been placed in newsracks at any airport. This Court notes that airports are public areas with heightened security concerns; the problems of terrorist activities at airports, such as Newark, are well document-

---

**16.** Obviously, anything more than the bare four walls of a terminal building could be considered "clutter". However, some items, including signs, trash receptacles and mailboxes are essential to the efficient operation of the terminal facilities and cannot be removed without dramatically reducing efficient service. Newsracks, on the other hand, merely duplicate already existing services in the terminal.

**17.** The Court recognizes that any object, whether it is a newsrack, telephone, garbage can or sign, projecting into the passenger movement corridors reduces the flow of pedestrian traffic. However, some disruption in ideal traffic flow is required to provide those services necessary for the efficient operation of the airport.

ed.[18] The defendants need not wait until the first explosive device is placed in a newsrack at the airport to take preventive measures.

Prohibiting the placement of newsracks in the terminals will not eliminate all security risks. This Court recognizes that many objects are already in place in the airport which present the same or similar security problems. However, these objects are necessary for the day-to-day operations of the airport. In this case, the Court is reluctant to condone thirty-four additions to the list of security concerns by authorizing placement of newsracks in the public areas of the buildings. By removing newsracks from the list of potential targets of terrorist activity, overall security at the airport is improved: the number of locations for concealing explosive devices is reduced and detection procedures in the event of a bomb threat[19] are simplified. This Court concludes that the defendants' efforts to maintain security is enhanced by prohibiting the placement of newsracks in the airport.

\*   \*   \*   \*   \*   \*

An airport is a unique public forum attracting large numbers of people for the purpose of safe and efficient air travel. The defendants' interests in safety, security, revenue raising, and efficient operations are particularly pressing in the context of an airport. The Court should not fragmentally evaluate each of the defendants' articulated interests alone. The interlocking nature of these factors necessarily causes a decision on one factor to have ramifications on the others. Simply stated, the whole is greater than the sum of its parts.

The Supreme Court has stated that the judiciary is not assigned the authority to replace the manager of a public forum, or endowed with the competence to decide how to best serve legitimate interests in ongoing operations. *See Clark,* 468 U.S. at 299, 104 S.Ct. at 3072. The judiciary should not replace the state in determining the best way to regulate the use of its property; courts should determine only whether a regulation permissibly advances the state's articulated interest. *See Regan v. Time,* 468 U.S. 641, 657, 104 S.Ct. 3262, 3271, 82 L.Ed.2d 487 (1984). In this case, the defendants' legitimate interests, in the aggregate, are served by the prohibition on the placement of newsracks in the public areas of the airport.

Recognizing that the ban on newsracks adequately serves the defendants' articulated interests, this Court must consider whether the regulation is narrowly tailored to serve the interests it was designed to further. The Supreme Court has stated that a regulation "is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz,* — U.S. ——, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988). In conducting this inquiry, this Court is not bound to look for some imaginable alternative that might be less burdensome on speech.

So long as the means chosen are not substantially broader than necessary to achieve the government's interest, ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree

---

**18.** New York area airports have had several incidents of explosive and incendiary device placements and detonations. On December 29, 1975, an explosive device at LaGuardia Airport was detonated, resulting in 11 deaths, 75 injuries and extensive property damage. On May 22, 1978, one incendiary device was detonated in Kennedy Airport, one incendiary device was detonated in LaGuardia Airport, and one incendiary device was detonated in Newark Airport. On March 25, 1979, an explosive device was detonated at Kennedy Airport, resulting in injury to four persons. On May 16, 1981, an explosive device was detonated at Kennedy Airport, resulting in one death and extensive property damage.

**19.** In 1987, the Port Authority Police filed 37 bomb threat reports for Newark Airport. In the first nine months of 1988, there were approximately 30 reports filed.

to which those interests should be promoted.

*Ward v. Rock Against Racism,* —— U.S. ——, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989) (citations omitted).

In the instant case, the problems associated with the placement of newsracks in the airport terminals are clear. Introduction of newsracks throughout the airport will occupy scarce terminal space without adding to services available to the public, will increase congestion, reduce safety and traffic control, impair revenue raising, create additional security risks, and inhibit efficient operations and maintenance. Because defendants' newsrack ban targets and eliminates the exact source of the problems noted above, this Court concludes that the prohibition of newsracks in the airport terminals is narrowly tailored.

Finally, this Court must consider whether the time, place and manner regulation imposed by the state leaves open adequate alternative channels of communication. "A restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *Tax Payers for Vincent,* 466 U.S. at 812, 104 S.Ct. at 2132. The inquiry is not merely whether alternatives exist, but also whether those alternatives constitute an adequate opportunity to conduct expressive activity. *See New Jersey Citizen Action,* 797 F.2d at 1261. This test looks only to the alternatives available within the public forum and is not concerned with those available channels of communication which exist outside the forum. *See Providence Journal,* 665 F.Supp. at 108.

It is clear that newsstands are a time tested means of newspaper distribution. Plaintiff, however, states that the location and hours of operation of newsstands restrict free access to newspapers. Evidence at trial demonstrates that newsstands are located in the central concourses of Terminal A and B as well as in each satellite area where the flight gates operate. When entering or exiting these areas, airline passengers in Terminals A and B must pass within forty feet of a newsstand. In Terminal C, there is one newsstand in the main terminal; three in Concourse 1; two in Concourse 2; and, one in the International area of the main building. Numerous signs throughout all three terminal buildings direct the public to newsstand locations.

Newsstand hours of operation cover nearly all scheduled flights at the airport. In Terminal A, the newsstand in the main building is open before every scheduled departure in the morning and after every scheduled arrival at night. The satellite newsstands operate from 6:30 A.M. to 11:00 P.M., the peak times for air travel. In Terminal B, the newsstand in the main building operates from 6:00 A.M. to 10:00 P.M.; in satellite B1, the hours are 6:30 A.M. to 11:00 P.M.; and, in satellite B3, the hours are 5:30 A.M. to 12:30 A.M. This schedule of hours covers all scheduled arriving and departing flights except for two arrivals scheduled after 12:30 A.M. This shortfall, if it be a shortfall, in the hours of operation of the newsstands at Terminal B is *de minimis* and cannot rise to the level of a cognizable violation of the First Amendment. Finally, in Terminal C, the newsstand in the main building is open twenty four hours; the newsstands on Concourse 1 and 2 are open from 6:00 A.M. to 10:00 P.M.; and, in the International area of the main terminal, the newsstand is open from 10:00 A.M. to 11:00 P.M.

The hours of operation at each terminal insure reasonable and adequate access to newspapers for the overwhelming majority of airport patrons at almost any hour.[20] Given the availability of several newsstands located throughout each terminal building and the hours of operation of these newsstands, this Court concludes that airport patrons have more than reasonable access to newspapers through existing channels.

Plaintiff makes much of the fact that defendant's leasing provisions grant con-

---

20. In addition, plaintiff's newspaper is distributed at the airport through the "Blue Chip" program. This program, sponsored by various air-lines operating out of the airport, provides airline passengers with complimentary copies of USA TODAY on various flights.

cessionaires exclusive or semi-exclusive licenses to distribute newspapers at the airport. In plaintiff's view, this scheme grants private individuals the authority to regulate newspaper distribution based on the individual's uncontrollable discretion.[21] Plaintiff misconceives the relationship and the strict controls imposed by the Port Authority.

Private concessionaires are permitted to establish operations in the airport under special lease agreements. While granting individuals the right to use terminal space, use of that space is subject to the ultimate control and regulation of the Port Authority. Concessionaires at the airport are not like private stores located along a public street; they operate their businesses as part of the public forum. Any attempt by the defendants or private concessionaires to prohibit the distribution of newspapers is subject to attack under the First Amendment. That is not this case. Newspapers are distributed throughout the public forum by concessionaires operating under the control of the Port Authority. This channel adequately serves the needs of the travelling public. At this juncture, there is no need to introduce an additional manner of distribution which impairs the defendants' legitimate interests in safe and efficient operations. Therefore, the defendants' ban on newsracks is a constitutional time, place and manner regulation on the distribution of newspapers in a public forum.[22]

## IV. EQUAL PROTECTION

■ Plaintiff alleges that defendants' actions and regulations violate its rights to equal protection under the Fourteenth Amendment of the United States Constitution in two respects:

(a) the Port Authority regulations permit concessionaires to distribute newspapers, but deny that right to all other persons; and

(b) the defendants allow individuals other than the plaintiff to exercise their First Amendment rights fully and distribute informational material at Newark International.

The Equal Protection clause directs that "all persons similarly circumstanced shall be treated alike." The Constitution does not require that "persons" different in fact or opinion be treated in the law as though they were the same. *See Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). The first step in the Equal Protection analysis is a determination that plaintiff is treated differently from others similarly situated. Next the Court must consider whether the challenged regulation disadvantages a "suspect class" or threatens the exercise of a "fundamental right". If either of these two classifications are implicated, the state regulating authority must demonstrate that the regulation has been precisely tailored to serve a compelling governmental interest. *See Plyler,* 457 U.S. at 217, 102 S.Ct. at 2395. Absent an adverse effect on a "suspect class" or "fundamental right", a regulation is upheld against an equal protection attack if it is rationally related to the achievement of legitimate governmental ends. *See G.D. Searle & Co. v. Cohn,* 455 U.S. 404, 408, 102 S.Ct. 1137, 1141, 71 L.Ed.2d 250 (1982).

**21.** Plaintiff attempts to inflate into a violation of due process, disputes between the publisher and private concessionaires to demonstrate that the right to distribute newspapers may be restricted at the whim of these private individuals without adequate notice or a prior hearing. This Court concludes, however, that such an argument is meritless. The dispute to which plaintiff refers represent only a brief argument with no real impact on First Amendment activity. Clearly the position of the concessionaire was not supported by defendants. Moreover, when brought to its attention, defendants immediately insisted upon and obtained corrective action. In addition, distribution of newspapers was never halt-

ed as a result of these commercial disputes. In any event, an attempt to limit or prohibit the distribution of plaintiff's newspapers by the Port Authority or private concessionaires may be swiftly remedied by appropriate legal action to enforce an absolute First Amendment right to the distribution of newspapers in a public forum.

**22.** For similar reasons, the defendants' ban on newsracks in the airport is deemed constitutional under the New Jersey Constitution Article 1, ¶ 6.

In this case, plaintiff is not treated differently from others "similarly situated". Plaintiff and the concessionaires at Newark Airport are not similar for purposes of the Equal Protection clause of the Fourteenth Amendment. In the context of this case, both entities are ultimately interested in a high volume of newspaper sales at the airport. However, it is clear to this Court that they are engaged in different businesses. The raison d'etre of plaintiff USA TODAY is to disseminate information; that for a concessionaire at the airport is to provide for sale a variety of commercial goods. This fundamental distinction in purpose between the two entities precludes a finding that they are similarly situated.

Moreover, there is no equal protection violation in the different treatment accorded plaintiff USA TODAY and those persons permitted by the defendants to distribute informational material at Newark Airport. The plaintiff and persons distributing other information are not similarly situated. Newsstands are not an available manner of distribution for the non-commercial information to which plaintiff is referring. In providing separate access for those persons while prohibiting plaintiff from selling newspapers, except through concessionaires, the defendants have provided adequate access for all individuals seeking to distribute First Amendment protected material in a public forum while recognizing the differences between each distinct type of publication.

Even if plaintiff was treated differently from others similarly situated, there is no violation of Equal Protection. Plaintiff's proposed activity does not fall within the "suspect class" category. Clearly, plaintiff is not "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or regulated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (*quoting San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973)). Nor are the "funda-mental rights" of free publication and free distribution prohibited by defendants' regulations. These fundamental rights guaranteed by the First Amendment are served by existing newsstands providing adequate distribution of various newspapers at the airport. Because neither of these two protected classifications are implicated, the regulation need only be reasonably related to a legitimate government interest. *See Searle,* 455 U.S. at 408, 102 S.Ct. at 1141. This Court has already concluded that the defendants' prohibition of newsracks is an appropriate way to serve the legitimate interests articulated by defendants. Therefore, defendants have not violated the Equal Protection clause.

\*　　\*　　\*　　\*　　\*　　\*

In the case at bar, application of the competing legal standards to the facts compels a determination that the defendants' actions in banning newsracks at Newark Airport does not contravene plaintiff's constitutional rights. The foregoing constitutes this Court's Findings of Fact and Conclusions of Law.