**GANNETT SATELLITE INFORMATION NETWORK, INC., d/b/a USA Today, Appellant,**

v.

**Stephen BERGER, as Executive Director, Port Authority of New York and New Jersey; Robert J. Aaronson, as Director, Aviation Department, Port Authority of New York and New Jersey; Morris Sloane, as Director of Aviation Operations, Port Authority of New York and New Jersey; Vincent Bonaventura, as General Manager of New Jersey Airports; W & J Lassiter, Inc.; American Airlines, Inc.; Northwest Airlines, Inc.; Piedmont Aviation, Inc.; Trans World Airlines, Inc.; United Airlines, Inc.; Delta Airlines, Inc.; Eastern Airlines, Inc.; New York Airlines, Inc.; and Continental Airlines, Inc., Appellees.**

**No. 89–5610.**

United States Court of Appeals, Third Circuit.

Argued Jan. 9, 1990.

Decided Jan. 12, 1990.

As Amended Feb. 22, 1990.

Order on Denial of Rehearing and Rehearing En Banc Feb. 22, 1990.

Robb M. Jones (argued) and Albert Shuldiner, Nixon, Hargrave, Devans & Doyle, Washington, D.C., for Gannett Satellite Information Network, Inc.

Hugh H. Welsh, Jersey City, N.J.; Arthur P. Berg (argued), Donald F. Burke, and Arnold D. Kolikoff, on the brief, for Port Authority appellees, Berger, Aaronson, Sloane, and Bonaventura.

William H. Boice (argued) and R. Scott Tewes, Kilpatrick & Cody, Atlanta, Ga., for Airline appellees.

Donald A. Robinson, Robinson, Wayne & La Sala, Newark, N.J., for amici curiae.

Peter C. Gould, Barry N. Steiner, and Richard A. Bernstein, Sabin, Bermant &

Gould, New York City, of counsel to the Newark Morning Ledger Co. and the Patriot–News Co.

Before GIBBONS, Chief Judge, and SCIRICA, Circuit Judge, and WALDMAN, District Judge.[*]

## OPINION OF THE COURT

GIBBONS, Chief Judge.

Gannett Satellite Information Network, Inc. ("Gannett") appeals from a judgment of the District Court of New Jersey dismissing its claims against several officials working for the Port Authority of New York and New Jersey ("Port Authority") and against various airline companies doing business out of Newark International Airport, 716 F.Supp. 140. In this suit, Gannett mounts a first amendment challenge against Port Authority regulations which prohibit Gannett from selling its newspaper, USA Today, at Newark Airport, except through concessionaires. At trial, Gannett argued that these regulations were unconstitutional on their face and as applied. After a lengthy hearing, the district court rejected both claims. This appeal followed. We will affirm in part and reverse in part.

### I.

The Port Authority of New York and New Jersey[1] is a bi-state public agency responsible, among other things, for operating Newark International Airport, one of the nation's busiest transportation facilities. In performing this function, one of the Port Authority's duties is to allocate the space in the Airport's three large passenger terminals to airlines and other companies wishing to do business at the Airport. Airline companies seeking access to terminal space in Newark Airport must sign long-term leases with the Port Author-

ity, which entitle them to use designated areas in the Airport's terminals, such as airline gates, ticket counters, baggage claim docks, and the like. The Port Authority generally leaves these airline companies free to use their space as they please. However, the airlines are required to obey and enforce the Airport's "Rules and Regulations," a series of rules promulgated by the Port Authority which place certain restrictions on how terminal space may be used.

The Port Authority also secures incidental services for the traveling public by leasing terminal space to privately-owned businesses. To this end, the Port Authority leases a considerable amount of terminal space to private concessionaires who agree to operate gift-shops and newsstands at various locations throughout the Airport's three terminals. Among the merchandise sold at these many gift shops and newsstands is written material of all sorts, including books, periodicals, and newspapers. Unlike the airline companies, however, the concessionaires are exempted from a number of the Port Authority's Rules and Regulations within the space in which they operate their businesses.

The dispute in this case arose in October of 1987, when the Port Authority denied Gannett's request to install USA Today vending machines throughout Newark Airport. At that time, the Port Authority's Rules and Regulations prohibited any commercial activity, and particularly the distribution of printed or written material without prior consent from the Port Authority. Noting that "the distribution of USA Today is presently adequately served by the newsstands at ... Newark International," the Port Authority concluded that it would not serve the interests of the Airport to allow

[*] Hon. Jay C. Waldman, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[1] The Port Authority was created in 1921 by an interstate compact between New York and New Jersey. See N.J.S.A. §§ 32:1–1 to 32:1–24 (1989); N.Y.Unconsol.Law §§ 6401–6423 (McKinney 1979). As an agreement between two states, the creation of the Port Authority required Congressional approval, which was given in the same year. See U.S. Const. art. I, § 10, cl. 3; S.J.Res. 88, 67th Cong., 1st Sess. (1921).

Gannett to install vending machines in the Airport's terminals. Appendix, at 495.

Gannett encountered further difficulties in November of 1987 when one of the principal concessionaires at Newark Airport, W & J Lassiter, Inc. ("Lassiter"), threatened to discontinue the sale of USA Today at its newsstands. Lassiter apparently threatened to take this action to retaliate against Gannett's practice of delivering more copies of its newspaper to Lassiter's newsstands than could be sold in a given day. *See* Appendix, at 496–97.

Threatened with the total loss of Newark Airport as a market for USA Today, Gannett filed suit on November 12, 1987, naming Lassiter, the Port Authority, and several Port Authority officials as defendants. *See* Appendix at 53.[2] Four months after Gannett filed suit, the Port Authority amended its Rules and Regulations, substituting the following three provisions:

[Rule 2] No person shall carry on any commercial activity at any air terminal without the consent of the Port Authority.

. . . .

[Rule 3] No vending machines for the sale of goods shall be permitted in the public areas of ... Newark International ... which are not occupied by a lessee, licensee or permittee. This provision shall not apply to vending machines in restrooms selling personal hygiene items.

. . . .

[Rule 10] No person shall post, distribute or display at an air terminal a sign, advertisement, circular, or any printed or written matter concerning or referring to commercial activity, except pursuant to a written agreement with the Port Authority specifying the time, place and manner of, and fee or rental for, such activity.

Appendix at 555. At trial, Gannett argued that these provisions—Rules 2, 3, and 10— together with the Port Authority's leasing arrangement with the airport's concession-

aire, amounted to a facially invalid regulatory "scheme" that vested governmental officials with the standardless discretion to censor written expression. In addition, Gannett claimed that the Port Authority's decision denying it permission to install vending machines throughout Newark Airport constituted a prior restraint in violation of the first amendment.

The district court, on July 6, 1989, rejected both of these claims. The district court reasoned, first, that the Port Authority's Rules and Regulations were immune from a facial challenge "[s]ince the scope and primary thrust of these regulations is directed toward commercial activity having nothing to do with the First Amendment." Appendix at 13. Moreover, "the regulations on their face are not directed narrowly and specifically at expressive activity and do not, *per se*, create a threat of censorship or the impact of a suppression of expressive activity without further review." *Id.* Turning to Gannett's second theory, the district court upheld the Port Authority's action as a valid restriction upon the time, place and manner of Gannett's expressive activity. The district court concluded that, even though Newark Airport is a public forum for first amendment purposes, the Port Authority's denial of permission to Gannett was content-neutral and narrowly tailored to serve significant governmental interests. The abundance of private newsstands at the airport, moreover, provided Gannett with more than an adequate number of alternative channels of communication.

## II.

On appeal, Gannett does not take issue with the district court's "as-applied" analysis. For purposes of this action, therefore, we will assume that the district court correctly held that Newark Airport is a public forum, and that the denial of permission to

---

**2.** Later, Gannett added to this list of defendants a series of airline companies leasing space at Newark Airport. *See* Appendix at 71. Before the trial commenced, Gannett withdrew its claims against Lassiter since by then Lassiter had terminated its relationship with Newark

Airport. Gannett also agreed to the voluntary dismissal of the Port Authority on the basis of *Port Authority Police Benevolent Assoc'n v. Port Authority*, 819 F.2d 413 (3d Cir.1987) (holding that the Port Authority is a state agency entitled to eleventh amendment immunity).

place USA Today vending machines throughout Newark Airport was a valid restriction upon the time, place, and manner of Gannett's speech. As a result, we must also assume that Gannett itself suffered no first amendment injury when the Port Authority refused to allow it to distribute its newspaper through free-standing vending machines.

The focus of this appeal, instead, is upon the facial validity of what Gannett characterizes as a constitutionally infirm regulatory "scheme" promulgated by the Port Authority. The doctrine invoked by Gannett in support of this facial challenge represents an interesting exception to certain well-accepted principles of justiciability. *See Massachusetts v. Oakes*, —— U.S. ——, ——, 109 S.Ct. 2633, 2637, 105 L.Ed.2d 493 (1989). As a general rule, a litigant challenging the constitutional validity of a law must establish an actual, not just theoretical injury caused by the challenged governmental action. As the Supreme Court has held, " 'one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.' " *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985) (quoting *United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960)). In a sense, this principle echoes the familiar doctrine of standing, which requires a litigant to set forth a concrete personal interest in the outcome of her suit in order to establish a "case" or "controversy" for purposes of Article III of the Constitution. *See Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Gannett points out, however, that first amendment doctrine relaxes this general requirement of a personal injury when the statute under review vests in governmental officials standardless discretion to regulate speech, such that it gives rise to an imminent threat of unconstitutional censorship. Thus, a litigant may challenge a law that vests governmental officials with standardless discretion even if the application of that regulation in the litigant's case is constitutionally permissible. In *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), for example, the Supreme Court invalidated a Maryland law that required prior state approval before an exhibitor could show a motion picture at its theaters. According to the Court, it was immaterial for constitutional purposes whether the plaintiff in this case had actually been deprived of a first amendment right:

> In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license.

*Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965); *see also Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940). In a long and celebrated line of cases, the Court has deployed this principle repeatedly to strike down statutes that, on their face, vested officials with a dangerously wide and unfettered degree of discretion to regulate speech. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (invalidating ordinance requiring marchers to seek permission from town mayor); *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (striking down standardless breach-of-the-peace statute); *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951) (invalidating ordinance prohibiting public worship without a permit from city police commissioner); *Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948) (invalidating ordinance requiring sound trucks to obtain permission from police chief).

■ These cases establish the principle that, for overbroad statutes affecting speech, the first amendment precludes the application of ordinary rules of severability. In order to ensure an optimal level of

constitutional enforcement, it is necessary to allow facial challenges to overbroad statutes irrespective of the plaintiff's particular injury. This is so because piece-meal litigation is an inadequate method of enforcing the Constitution when a governmental official is given unrestricted authority to regulate speech on a case-by-case basis. The particular evil associated with a standardless grant of authority is not so much that it will always be exercised illicitly, but that the ordinary course of litigation will invariably fail to provide an adequate check against the likelihood that, at some point, it will. Hence, in a situation in which a governmental official is given complete and unbridled discretion to choose which speakers to favor and which to stifle, it is proper to permit a challenge to the wording of the statute in order to protect future victims against the potential for abuse that the statute creates. As the Supreme Court has noted, "an individual whose own speech or expressive conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Brockett*, 472 U.S. at 503, 105 S.Ct. at 2802.

■ In order successfully to challenge a statute on the basis of overbreadth, however, a litigant must establish something more than a mere possibility that a particular grant of discretion might be used unconstitutionally in some other setting. In the recent case of *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Supreme Court struck down a municipal ordinance requiring newspapers to obtain a permit from the town's mayor in order to place newsracks on public property. In doing so, the Court announced the prevailing standard for deciding when a particular statute is unconstitutionally overbroad: "a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by sup-

pressing disfavored speech or disliked speakers." *Id.* 108 S.Ct. at 2145. The Court was careful, however, to note that for a statute of this sort to be unconstitutional, it must involve a grant of discretion that specifically relates to expression. Acknowledging that overbroad grants of discretion can, in themselves, violate the first amendment, the Court commented:

> This is not to say that the press or a speaker may challenge as censorship any law involving discretion to which it is subject. *The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks.*

*Id.* (emphasis added). Hence, a statute granting discretion to governmental officials can be said to violate the first amendment only if it specifically relates to expression and only if it gives rise to a "real and substantial" risk of unconstitutional censorship.

### III.

Gannett argues in this appeal that the Port Authority has promulgated a "scheme" of regulations that vests in governmental officials an unconstitutional degree of standardless discretion. The components of this "scheme" are Rules 2, 3, and 10 of the Port Authority's Rules and Regulations as well as the Port Authority's lease agreements with Newark Airport's concessionaires. According to Gannett, these four strands constitute a "scheme" which on its face violates the first amendment under the principles set forth in *Lakewood*. This claim, however, conflates four distinct regulatory elements into an amorphous whole and thereby needlessly obscures the first amendment issues raised in this case. Instead of considering the regulatory elements involved here as a single totality, we will, therefore, subject each component of the alleged "scheme" to independent constitutional scrutiny.

### A. *Lease Agreements with Airport Concessionaires*

■ One component of the regulatory scheme about which Gannett complains is

the Port Authority's lease agreements with the concessionaires serving Newark Airport. According to Gannett, these lease agreements permit "the concessionaires [to] act as First Amendment gatekeepers at Newark Airport" since "no standards exist to guide the concessionaires' judgment save their own marketing objectives." Brief for Appellant at 39. Gannett concludes that, in order to protect newspapers against the potential for abuse, the Port Authority should impose "narrow, objective, and definite standards guiding the exercise of [the concessionaires'] discretion." *Id.* at 44–45.

The obvious difficulty with this argument is that it fails to take into account settled principles of state action. Because the Constitution only regulates governmental behavior, an action taken by a private individual is immune from constitutional scrutiny unless that behavior "may be fairly treated as that of the state itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *see also Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). In this case, there is no question that the concessionaires leasing space at Newark Airport are private entities pursuing private ends. The Airport's newsstands, moreover, are free to make decisions regarding the newspapers and periodicals they wish to distribute without interference from the government, since the Port Authority's Rules and Regulations do not encompass this aspect of the concessionaires' conduct.

Absent any explicit governmental involvement in the distribution decisions of these private newsstands, the actions taken by the concessionaires in this case may not fairly be attributed to the Port Authority. The record fails to indicate any tacit governmental involvement in the concessionaires' actions with respect to the distribution of newspapers. These concessionaires, moreover, do not perform the sort of "public function" that, under certain circum-

stances, may be enough to transform the behavior of private entities into that of the government. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (holding that termination of services by a privately owned utility company is private action); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (prohibiting the imposition of criminal trespass penalties against a speaker exercising first amendment rights in a company town). Nor do we perceive any entanglement with a public entity such that the concessionaires' decisions may be attributed to the government. *See Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (holding that the exercise of a statutory right to attach debtor's property does not involve state action).

The fact that the concessionaires lease their premises from a governmental entity also falls short of triggering state action. It is true, of course, that the Port Authority's act of signing a lease is, per se, governmental. However, it is well established that a licensing relationship is insufficient in itself to give rise to wholesale governmental responsibility for the actions taken by a private licensee or tenant. *See Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (holding that the granting of a liquor license, in itself, is insufficient to make the licensee a state actor). In such circumstances, state action will be recognized only when there is a "symbiotic" relationship between the private and governmental entities, such that the public might reasonably conclude from that relationship that the government has lent its support to the private entity's actions. *See Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (holding that symbiotic relationship between private cafeteria and publicly owned parking lot is enough to give rise to state action). In this case, we fail to perceive any danger that the public might attribute the behavior of private newsstands to the Port Authority. We therefore conclude that the concessionaires

are private actors for constitutional purposes.

In addition to these state action problems, Gannett's challenge to the Port Authority's leasing arrangement with its concessionaire raises far greater constitutional problems than it solves. In attacking the scope of discretion afforded to newsstands at Newark Airport, Gannett suggests that the Port Authority ought to impose regulations that would govern the concessionaires' decisions affecting the distribution of newspapers—in effect, that the Port Authority in this case should require airport concessionaires to carry USA Today.

However well-intentioned, Gannett's panacea would undoubtedly be more harmful than the disease it is intended to cure. Subjecting newsstands to regulations of this sort would unquestionably amount to state action, and would very probably run afoul of the very first amendment principles under which Gannett seeks relief. The first amendment prohibits the government from forcing individuals to endorse particular points of view against their will. *See, e.g., Abood v. Detroit Board of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (holding that a public employees' union may not compel members to contribute dues for the purpose of endorsing an ideological message not relevant to the union's functions); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (prohibiting state from requiring citizens to display state slogan on their automobile license plates). To that end, the Supreme Court has rejected the suggestion that the first amendment creates a constitutional right of access to private means of mass media distribution. *See Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). We are mindful, therefore, of the serious constitutional problems that would arise were the Port Authority to entangle itself in the private concessionaires' decisions regarding the newspapers they wish to distribute at their private newsstands. Because of these problems, we must reject Gannett's challenge to the discretion afforded private concessionaires at Newark Airport under the terms of their leases with the Port Authority.

### B. *Regulation of Vending Machines and Commercial Activity*

The next two targets of Gannett's attack are Rules 2 and 3 of the Rules and Regulations, which respectively govern commercial activity and the use of vending machines at Newark Airport. These regulation provide:

> [Rule 2] No person shall carry on any commercial activity at any air terminal without the consent of the Port Authority.
>
> . . . .
>
> [Rule 3] No vending machines for the sale of goods shall be permitted in the public areas of . . . Newark International . . . which are not occupied by a lessee, licensee or permittee. This provision shall not apply to vending machines in restrooms selling personal hygiene items.

Appendix at 555. Citing to the principles enunciated in *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), Gannett argues that these regulations are facially invalid.

With respect to the regulation of vending machines, we would be required to entertain Gannett's argument were it the case that Rule 3 vested in Port Authority officials the unbridled discretion to choose among vending machines and to permit some but not others to operate at Newark Airport. The simple fact, however, is that no such discretion is conferred by Rule 3. On its face, this regulation prohibits altogether the installation of vending machines for the sale of goods in non-leased areas at Newark Airport, and leaves no room for the Port Authority to carve out exceptions on a case-by-case basis. Because Rule 3 grants no discretion at all to Port Authority officials, it is immune from Gannett's facial attack and therefore survives constitutional scrutiny. We therefore have no occasion to consider whether this regulation would pass muster under *Lakewood.*

Rule 2, on the other hand, does empower the Port Authority to decide on a case-by-case basis whether a person may "carry on any commercial activity at any air terminal." Unlike the prohibition of vending machines, this regulation vests Port Authority officials with a considerable degree of discretion to regulate activity at the Airport. Rule 2, moreover, fails to set forth any standards by which the Port Authority is supposed exercise this power.

As the Supreme Court stated in *Lakewood,* however, not all regulations vesting agencies with discretion are subject to a facial challenge. The law in question must have a close enough nexus to expression or

expressive conduct to give rise to a substantial threat of undetectable censorship. *See Lakewood,* 108 S.Ct. at 2145. Unlike the statute struck down in *Lakewood,* the Port Authority's Rule 2 applies generally to commercial activity, and thus is not "narrowly and specifically" directed at expression. *See id.* Like laws requiring individuals to obtain building permits for certain purposes (the example given in *Lakewood*), a regulation requiring governmental consent for commercial activity will seldom serve as an effective means of censorship. Of course, like any law conferring a sphere of discretion upon government officials, Rule 2 creates some opportunity for abuse. However, we are persuaded that this regulation "provide[s] too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse." *Id.* at 2146. Rule 2, therefore, survives Gannett's facial attack.

## C. *Prohibition on Distribution of Written Matter*

 Finally, Gannett challenges as facially invalid Rule 10 of the Port Authority's Rules and Regulations, which prohibits the distribution at Newark Airport of written expression "relating to commercial activity" without the consent of the Port Authority. In full, Rule 10 provides:

> No person shall post, distribute or display at an air terminal a sign, advertisement, circular, or any printed or written matter concerning or referring to commercial activity, except pursuant to a written agreement with the Port Authority specifying the time, place and manner of, and fee or rental for, such activity.

Appendix at 555.

A threshold question we must address is whether this rule authorizes the Port Authority to regulate the distribution of newspapers at all; whether, that is, the category of speech to which Rule 10 applies encompasses newspapers and periodicals. On the one hand, the wording of Rule 10 suggests that the Port Authority might have intended to regulate only commercial speech. The examples it gives—"sign[s]," "advertisement[s]," and "circular[s]"—intimate a narrow class of purely commercial expression. *Id.* However, the regulation also invokes the expansive phrase "any printed or written matter concerning *or referring* to commercial activity." *Id.* (emphasis added). This language, we think, is broad enough to encompass newspapers or periodicals. Newspapers "concern[ ] or refer[ ]" to commercial activity all the time. Many of the subjects explored in newspaper stories concern commerce. More obviously, newspapers are almost always filled with advertisements and classified ads that perform a purely commercial function for the businesses and individuals paying for them. In short, because newspapers constitute "printed or written matter concerning or referring to commercial activity," we conclude that Rule 10 applies to the distribution of newspapers or periodicals at Newark Airport and is not confined to purely commercial speech.

In order for its facial challenge to succeed, Gannett must show that the discretion conferred by the challenged regulation is standardless. The regulation involved in *Lakewood,* 108 S.Ct. 2138, for example, vested a local mayor with the authority to grant or deny permission to place newspaper racks in public areas, but failed to set forth any guidelines for doing so. In this case, the regulation under attack also fails adequately to set forth any standards by which the Port Authority is to exercise its discretion. Rule 10 empowers the Port Authority to grant or deny publishers the permission to distribute their newspapers at Newark Airport, but says nothing at all about how that power may be wielded. Absent from Rule 10, for example, are any indications that content-based judgments are prohibited. Nor does Rule 10 establish any affirmative guidelines describing the reasons why some expressive material may be distributed at the Airport and others not. The Port Authority thus has failed to establish any parameters for the exercise of its authority to regulate a broad category of speech at Newark Airport.

The final consideration, as elaborated in *Lakewood,* is whether Rule 10 has "a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat" of censorship. *Lakewood,* 108 S.Ct. at 2145. We believe that it does. There is no question that this regulation directly relates to expression: it confers upon the Port Authority the power to regulate "printed or written matter concerning or referring to commercial activity." As such, this regulation plainly differs from Rule 2, which regulates "commercial activity" and as such applies to a wide swath of non-expressive conduct. Moreover, without the benefit of standards guiding the Port Authority's decisions with respect to "printed or written

matter," Rule 10 gives rise to the very real possibility that officials at the Port Authority, sooner or later, may restrict speech in a way that contravenes the first amendment. We believe that this threat is real and substantial, given the complete absence of any standards guiding the Port Authority, and given the likelihood that Newark Airport, like other airports, will continue to attract individuals who wish to communicate their messages to the public through the distribution of written expression.

### IV.

For the foregoing reasons, we affirm the district court's judgment dismissing Gannett's complaint with respect to the challenges to Rules 2 and 3 of the Port Authority's Rules and Regulations, as well as to the lease agreements with the concessionaires serving Newark Airport. However, because we hold that Rule 10 is invalid on its face, we reverse the district court's judgment insofar as it applies to Rule 10 and remand for further proceedings consistent with our decision.

SUR PETITION FOR REHEARING

Present: A. LEON HIGGINBOTHAM, Jr., Chief Judge, SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN and NYGAARD, Circuit Judges, WALDMAN *, District Judge.

The petition for rehearing filed by appellant in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular service not having voted for rehearing, the petition for rehearing by the panel and the Court in banc, is denied.[1]

---

* As to panel rehearing only.

1. The panel rejects the suggestion that it misapprehended petitioner's constitutional claims. Gannett consistently maintained on appeal that this was a facial challenge. Although claiming to disagree with the district court's time, place, manner analysis, Gannett asserted only that the regulations vested Port Authority officials with unbridled discretion and thus were not content-neutral. We addressed the issue of unbridled discretion with respect to the private concessionaires' lease agreements and the three regulations challenged.